46 F.3d 1347
 Lawrence R. ALBERTI, et al., Plaintiffs-Appellees, Cross-Appellants,
v.
Johnny KLEVENHAGEN, The Sheriff of Harris County, et al.,
Defendants-Third Party Plaintiffs-Appellees,
v.
Ann RICHARDS, The Governor of Texas, et al.,
Defendants-Third-Party Defendants-Appellants
Cross-Appellees.
Lawrence R. ALBERTI, et al., Plaintiffs-Appellees,
v.
Johnny KLEVENHAGEN, The Sheriff of Harris County, et al.,
Defendants-Third Party Plaintiffs-Appellees,
v.
Ann RICHARDS, The Governor of Texas, et al.,
Defendants-Third Party Defendants-Appellants.
 Nos. 93-2079, 93-2353 and 93-2651.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 23, 1995.
 
 John B. Worley, Robert Ozer, Asst. Attys. Gen., Dan Morales, Atty. Gen., Javier Aguilar, Sp. Asst. Atty. Gen., Austin, TX, for appellants.
 James T. Oitzinger, Gerald M. Birnberg, Williams, Birnberg & Andersen, Houston, TX, for Alberti, Collin, Langer, Pina, Reed & Sellers.
 Eileen C. Begle, Asst. County Atty., Houston, TX, for Klevenhagen.
 Lisa S. Rice, Sr. Asst. County Atty., Houston, TX, for Lindsay, Lee, Radack & Eversole.
 Appeals from the United States District Court for the Southern District of Texas.
 Before KING and BENAVIDES, Circuit Judges, and LAKE, District Judge.*
 KING, Circuit Judge:
 
 
 1
 In this appeal, we are asked once again to examine proceedings involving the conditions of confinement at the Harris County jails and the respective responsibilities of the State of Texas and Harris County for ensuring that those facilities comply with constitutional standards. In the most recent district court proceedings surrounding the jails, the district court, sua sponte, entered a "final order" which, inter alia, modified a 1975 "Consent Judgment" and other subsequent orders. The final order also mandated the implementation of a remedial plan that was jointly submitted by the County and State. Further, the district court's order dictated that the State pay the full expense of the programs included in the joint remedial plan with the exception of certain programs falling within the traditional role of county detention facilities. Additionally, the district court set the constitutional capacity of the jails at 112.5% of design capacity, ordering the State to pay a fine for each inmate in excess of that cap housed in the Harris County jails. The district court also allocated the costs of monitors appointed to survey the conditions of the jails, taxing the State for ninety percent of fees incurred by the monitors and the County for the remaining ten percent of the monitors' fees. The State appealed and the plaintiff-prisoners cross-appealed. We affirm in part and reverse and remand in part.
 
 I. BACKGROUND
 
 2
 Because so many of the issues raised in this appeal are controlled by the principle of law of the case,[1] we set forth the relevant history of this case and the rulings of prior panels of this case in some detail. This case originated almost two decades ago when Lawrence Alberti and his fellow inmates (the "plaintiff-prisoners"), complaining of the conditions in the Harris County jails, filed a class action lawsuit against certain Harris County officials (collectively the "County").[2] The district court, based on extensive hearings, found the conditions in the jail to be inhumane. See Alberti v. Sheriff of Harris County, 937 F.2d 984, 987 (5th Cir.1991) (Alberti I ). Subsequently, on February 4, 1975, the plaintiffs and the County entered into a "Consent Judgment" calling for renovations of existing facilities, the development of a new jail, and improvements in staff and security at the jails. See Alberti v. Sheriff of Harris County, No. 72-H-1094, slip op. at 1 (S.D.Tex. Feb. 4, 1975); see also Alberti I, 937 F.2d at 987. The litigation, however, was far from over, and the "district court retained jurisdiction to issue interim orders." Id. Ten months later, in December of 1975, the district court issued an opinion providing guidelines for streamlining the criminal justice system, implementing an effective pretrial release program, and improving the living conditions in the jails. See Alberti v. Sheriff of Harris County, Texas, 406 F.Supp. 649, 654 (S.D.Tex.1975).
 
 
 3
 By 1982, the County had completed a new jail (the "Franklin Jail"), with more than three times the capacity of the old central jail (the "old San Jacinto Jail"). The County also maintained a detention center in Humble, Texas, and upon the opening of the Franklin Jail, the County closed the old San Jacinto Jail. Alberti I, 937 F.2d at 987. The district court, however, remained involved in the jails' operation and addressed staffing and supervision concerns in the jails. Id. (discussing Alberti v. Klevenhagen, 606 F.Supp. 478 (S.D.Tex.1985), and Alberti v. Heard, 600 F.Supp. 443 (S.D.Tex.1984)). After consulting with an expert, the County determined that it would need additional space, and therefore the County authorized construction of a third jail (the "new San Jacinto Jail") and the renovation of the old San Jacinto Jail. Id.
 
 
 4
 Eager to be free from the yoke of litigation, in February of 1987, the County filed a motion for final judgment and permanent injunction. In order to assess the County's compliance with its prior orders and to determine the maximum capacity of the jails, the district court appointed three monitors--a special master, a medical monitor-assessor, and a jail monitor-assessor (collectively the "monitors"). Alberti I, 937 F.2d at 987. The monitors examined eighteen conditions and found that the County had complied fully with nine conditions, had complied partially with seven conditions, and had failed to comply with only two conditions of the court's prior orders. Additionally, the monitors found that, as of June 1, 1987, the county jails' population exceeded their design capacities by only five percent. Id. Although the County had made substantial progress in conforming the jails to constitutional requirements, the monitors recommended that the court continue supervising the jails in light of the County's "inordinate delay in achieving substantial compliance." Id.
 
 
 5
 Meanwhile, the State of Texas was embroiled in a separate controversy involving the conditions of its own prisons. After years of litigation, in 1985, the State entered into a stipulation, requiring it to limit its prison population to ninety-five percent of capacity. Alberti I, 937 F.2d at 987 (discussing Ruiz v. Lynaugh, 811 F.2d 856 (5th Cir.1987)). This agreement translated into difficulties for the County; in order to stay within the limits set by its stipulation, the State periodically refused to admit "convicted felons sentenced to the State prison system, and ready for transfer, but awaiting transfer in the county jails." Id. Two years later, the State attempted to create a more orderly system of admissions by adopting a "scheduled admissions policy" which set daily quotas on the number of transfer-ready felons from each County that the State would accept into its prisons.
 
 
 6
 The State's policies were disastrous for the County. Whereas the County had been near compliance with the district court's orders in 1987, by September of 1988, the monitors found that the population of the county jails had swelled to thirty percent over design capacity, resulting in dangerous overcrowding.[3] The monitors determined that the appropriate population levels at the Franklin Jail and the detention center were ninety-five percent of design capacity, and the monitors recommended that the district court set population caps that, in time, would allow the proper population level to be obtained. See Alberti I, 937 F.2d at 988.
 
 
 7
 After receiving the monitors' report, the court sua sponte ordered the County to deliver at least 290 transfer-ready felons per week to the Texas Department of Corrections (later Texas Department of Criminal Justice--Institutional Division). The State, however, refused to accept the transfers, and admitted only the number of prisoners from the County specified in its scheduled admissions policy. See id. Thus, the County was unable to comply with the court order. See id.
 
 
 8
 The County's inmate population continued to balloon, and in December of 1988, the County argued that it could not comply with the court's order without the State's participation. Thus, the County moved the district court to force the plaintiff-prisoners to join the State as a defendant. The court refused the motion, but allowed the County to file a third-party complaint against the State.[4] Alberti I, 937 F.2d at 988; see also In re Clements, 881 F.2d at 148. After several months of procedural wrangling, the plaintiffs and the State entered a joint request that certain pending motions be transferred to the court adjudicating the state prison conditions case, the Ruiz court. Although the district court denied the requests, we granted a writ of mandamus and transferred to the Ruiz court:
 
 
 9
 so much of the relief portion of the third-party complaint as seeks an injunction of ordering our individual petitioners (in their official capacities) [the third-party State defendants] to receive or take prisoners into TDC confinement or to otherwise take action in the operation or management of the TDC-operated confinement facilities.
 
 
 10
 Alberti I, 937 F.2d at 989 (quoting In re Clements, 881 F.2d at 154). We, however, declined to stay the impending bench trial in the Alberti case, noting that "until the liability merit issues in the third-party complaint [were] determined, there [was] no occasion to transfer any portion of the third-party complaint." In re Clements, 881 F.2d at 154.
 
 
 11
 Meanwhile, the monitors continued their work, and they saw the population of the county jails continue to swell. "To put this in some perspective," the monitors noted, "Harris County now has more prisoners sleeping on the floor of its detention facilities than the total number of convicted offenders incarcerated in fourteen states." Alberti I, 937 F.2d at 989. In a report issued on April 11, 1989, the monitors revised their recommendations and suggested that, after periodic reductions, the jails' population be capped at the design capacity of the jails. The situation did not improve, and by June of 1989, the monitors commented that prison conditions were "intolerable[ ] [and] shocking to the conscience." Id. at 990. Late in the summer of 1989, the jails' population was at almost 189% of design capacity--forty-five percent of which (more than 3400) were transfer-ready felons.
 
 
 12
 From August 14 through August 18, 1989, the district court held a merits liability bench trial. See id. Witnesses testified about the deleterious effects of the overcrowding on the jails, and one of the monitors described how protection suffered as a result of "inadequate staff, inadequate ventilation and food service, supply shortages, precarious fire safety, and a medical system on the verge of collapse." Alberti I, 937 F.2d at 990.
 
 
 13
 After hearing the testimony and conducting additional hearings, the district court issued its findings of fact and conclusions of law on September 25, 1989. The court found that, primarily as a result of "extreme overcrowding," the conditions in the jails were "cruel and unusual in violation of the Eighth and Fourteenth Amendments." As the district court described, overcrowding was so severe that:
 
 
 14
 2800-2900 prisoners slept on floor each night, forming a "human carpet" in some of the cellblocks, that the staff was inadequate to assure the safety of all prisoners, that there has been a great increase in the disciplinary violations, that there were problems with plumbing and ventilation, that fire safety was "severely compromised," that supplies and food service were inadequate, that medical care conditions reflected "conscious indifference towards the inmates' serious medical needs," and that county judges gave greater weight to pretrial release recommendations than state judges.
 
 
 15
 Id. at 990. Additionally, the district court found that under Texas law, the County was responsible for the violations, but the court also found that the State was jointly liable "because, under Texas law, it had the 'primary responsibility for convicted felons.' " Id. (quoting Tex.Rev.Civ.Stat. art. 4413(401) Sec. 1.02) (repealed 1991)). Finally, the district court transferred the County's third-party complaint against the State to the Ruiz court. Alberti I, 937 F.2d at 990.
 
 
 16
 The focus of the litigation then turned to the remedial aspects of the case. On March 15, 1990, after the State and the County had submitted their remedial plans and the courts had held hearings, the combined courts entered a joint remedial order. This order was replaced by a second order, nunc pro tunc, on April 5, 1990. Id. at 991. The order required, inter alia, the State and the County to reduce the county jails' population and compelled the State to remove more than 9,000 transfer-ready felons from the county jails. Additionally, the order mandated the development of alternatives to incarceration and prescribed the release of prisoners for noncompliance with the order. Id.
 
 
 17
 As the order was implemented, the situation in the county jails began to improve. The County completed the renovations of the old San Jacinto jail, increasing its total design capacity. Alberti I, 937 F.2d at 991. Moreover, a year after the bench trial, the jails' population stood at 130% of capacity, and the number of transfer-ready felons had dropped to under 1100. Id.
 
 
 18
 On September 7, 1990, after the previous order expired, a third remedial order was entered. Id. This order, among other things, required the County to occupy the new San Jacinto Jail by September 1 of the following year, and mandated " 'a substantial daily fine for each day beyond September 1, 1991 [that the County] fail[ed] to occupy' " the new San Jacinto Jail. Alberti I, 937 F.2d at 991. The order also set a time table for jail population reduction and established population caps. Finally, the order prescribed the development of alternatives to incarceration in the event of non-compliance. Id.
 
 
 19
 Over the next few weeks, when the population goals had not been met by the dates specified in the prior orders, the district court issued a series of orders commanding the release of more than 250 pretrial and convicted misdemeanants. The State and the County appealed these orders, and, on September 21, 1990, we granted a partial stay on the district court's orders. Later, we withdrew the stay "on the understanding that, first the combined courts would not release felons without sufficient notice for application by the parties for further stay, and, second, that the parties would work together 'to obtain a process that will protect the integrity of the criminal justice system as well as the rights of prisoners.' " Id.
 
 
 20
 In October of 1990, the district court held a hearing to consider new proposed remedial plans. Two days after that hearing, the court entered an order noting that "clearly the County and State defendants have not yet developed a feasible strategy for addressing the overcrowding problem in Harris County detention facilitates that precludes the need for further release of inmates." Alberti I, 937 F.2d at 991. The court noted that the prison populations had "climbed to more than 1800 over their constitutional capacities and more than 500 over the [target] caps imposed by the Court in early September." Id. Thus, the court concluded that "[t]he failure of County and State officials to develop alternatives leaves the Court with no choice but to rely on further releases." The court, however, did note that "elements of a possible plan had surfaced" and ordered "the County and State defendants [to] meet and [to] work with the Special Masters ... to develop an acceptable plan for dealing with the short-term population crisis in Harris County facilities." Id. at 992.
 
 
 21
 After further procedural machinations in which the court gave the County and the State extensions to develop a remedial plan, on February 7, 1991, the court found that the jails still exceeded the population limits set in the September 1990 order. Alberti I, 937 F.2d at 992. Consequently, the court issued a fourth remedial order. This order superseded all of the prior remedial orders and required, among other things, that the jails' population be reduced to constitutional capacity within forty-five days. See id. This order also required that county prisoners make up less than seventy-five percent of the population and that transfer-ready felons constitute less than twenty-five percent of the population.
 
 
 22
 Further, the order instructed the county sheriff to transfer certain inmates to other Texas county detention facilities "if necessary to meet the overall population cap." Moreover, the district court ordered the State to remit $750,000 to the court, the proceeds of which would be used to reimburse the County for a per prisoner per diem paid to the counties receiving transferred prisoners. Under this order, the County would not be reimbursed for prisoners sent to other counties when the jail population of non-transfer-ready felons exceeded seventy-five percent of the population cap.[5]
 
 
 23
 The County and the State both sought to modify the February 7 order. Id. Additionally, the State filed a notice of appeal and a motion to vacate. See Alberti I, 937 F.2d at 992. The State also asked this court for a writ of mandamus vacating the district court's order requiring the State to deposit $750,000 and enforcing or modifying our decision in In re Clements. In the alternative, the State requested a stay of the portion of the order requiring the $750,000 deposit, a writ of prohibition, summary reversal, or certification to the Texas Supreme Court. See Alberti I, 937 F.2d at 992.
 
 
 24
 The district court altered its order on March 15, 1991 and also denied the motions to vacate or to stay the order. The State and County filed new notices of appeal. Five days after the district court modified its order, this court also denied the State's stay request. On March 21, 1991, the United States Supreme Court stayed the provision, but later withdrew its stay. See id.
 
 
 25
 The State and the County then appealed the September 25, 1989 findings of fact to this court. It is this appeal that became Alberti I. After establishing our jurisdiction, we examined the question of who was responsible for the condition of the county jails. After parsing the law in this area, we rejected the State's argument that it had no responsibility for the conditions of the county jails. Instead, we agreed with the district court's conclusion that "Texas law impose[d] responsibilities on both the State and the County," and we accepted the lower court's reasoning that "the fact that the State of Texas has virtually complete freedom to decide who will be responsible for the confinement of felons provides no shield from liability for the State ... in this case because state law clearly places the primary responsibility for the confinement of felons upon them." Alberti I, 937 F.2d at 992 (internal quotations and citation omitted).
 
 
 26
 We also remanded the case to the district court to determine, in light of the Supreme Court's decision in Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), whether the County and/or the State acted with the "deliberate indifference" required to sustain a claim that prison conditions constitute cruel and unusual punishment under the Eighth Amendment. Alberti I, 937 F.2d at 998.
 
 
 27
 We then examined the County's contention that the district court erred in determining that the jail's constitutional capacity equaled its design capacity. We rejected the County's argument. We noted that because the district court "expressly recognized its obligation to consider the 'totality of the conditions' [a]nd contemplated a number of factors in addition to design capacity, ... the finding was not clearly erroneous." Id. at 1000-01.
 
 
 28
 Next we turned to the remedial issues. First, we rejected the State's argument that the district court's orders violated the Eleventh Amendment's prohibition against federal courts enforcing state law against the state. See Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). We noted that, because it is responsible for transfer-ready felons, the State had federal constitutional duties to its own prisoners in county jails. Agreeing with the Second and Sixth Circuits, we commented that, " '[t]he State cannot ... wash its hands of its federal constitutional responsibility for the detention conditions of such prisoners [that are convicted and awaiting transfer] because they are temporarily housed in [other] facilities....' " Alberti I, 937 F.2d at 1001 (quoting Benjamin v. Malcolm, 803 F.2d 46 (2d Cir.1986)); see also Tate v. Frey, 735 F.2d 986 (6th Cir.1984).
 
 
 29
 Second, we rejected the State's contention that the district court's orders violated the Eleventh Amendment because they exacted monetary relief. We described that "the plaintiffs established a federal constitutional violation, and the state is a responsible party. The required payments are thus 'a necessary consequence of compliance in the future with a substantive federal-question determination.' " Alberti I, 937 F.2d at 1001 (quoting Edelman v. Jordan, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974)).
 
 
 30
 We also declined to accept the State's argument that the district court should have abstained from ordering the State "to pay for the housing of [transfer-ready] felons pending the ultimate resolution of state litigation" that would determine the respective responsibilities of the County and the State to the conditions of confinement in the county jails. Id. at 1002. We found that abstention was not appropriate in this case, particularly in light of the fact that the district court remedy flowed from the only state law on the subject and assessed responsibility for the transfer-ready felons against the State. Id. (discussing County of Nueces v. Texas Board of Corrections, No. 452,071 (Dist.Ct. of Travis County, 126th Judicial Dist. of Texas 1991)).[6]
 
 
 31
 Further, the State urged a variety of procedural errors. We rejected the State's contention that the district court lacked the power to unilaterally issue the February 7 order. Alberti I, 937 F.2d at 1003. Similarly, we found wanting the State's contention that its due process rights were violated because the February 7 order was issued without a hearing. Specifically, we noted that, "[g]iven the large number of hearings held in Alberti, it is difficult to take this argument seriously. At any rate, it is clear that the order was the direct product of a hearing held on October 22, 1990." Id.
 
 
 32
 After rejecting the State's remaining arguments, we consolidated the State's and County's various pending motions and appeals. We then remanded the case to the district court for "the limited purpose of allowing the district court to enter findings of fact regarding the issue of deliberate indifference."[7] Id. at 1004. On August 7, 1991, the district court entered findings of fact, stating that "the State defendants' and, to a much lesser degree, the county defendants' awareness of the extremely cruel conditions in the county facilities and their failure to take steps to remedy those conditions constitutes deliberate indifference...." The State and the County appealed.
 
 
 33
 Meanwhile, the monitors and the parties continued their efforts to formulate a plan to address the condition of the jails. On June 8, 1992, the monitors entered tentative findings of fact with the district court. The next day, the State and the County submitted a joint remedial plan to the court. Over the next several weeks, the State and the County submitted their objections to the monitors' findings of fact. During the summer, the State and County also filed numerous motions and responses contesting who should pay certain fees and costs associated with the litigation.
 
 
 34
 On September 29, 1992, the district court issued its "final order" and a memorandum opinion. In its final order, the district court adopted the monitors' June 8 findings of fact in their entirety and imposed certain duties on the County.[8] Additionally, the district court mandated the implementation of the State's and County's June 9 joint remedial plan. Moreover, the court ordered that the State pay "the full expense of all programs [included in the plan] except those ... falling within the traditional role of County detention facilities."
 
 
 35
 The order also imposed a population cap on the county jails, determining that the constitutional capacity of the jails was 112.5% of their design capacity or 9800 inmates.[9] The court directed that these caps should be met by the spring of 1993, and it noted that the "State defendants shall pay to the court a fine of $50.00 per inmate over the cap per day after March 31, 1993 that the population in the Harris County facility exceeds 9800 inmates." The court also allocated the expenses of the monitors, ordering the State to pay ninety percent of the monitors' fees incurred after February 1, 1989 and the County to pay the balance. Finally, the court retained jurisdiction "to resolve request for attorney's fees and to ensure compliance with this final order."
 
 
 36
 On November 19, 1992, the district court entered an order denying the State's and the County's motions to alter or to amend the September 29 order and the plaintiff-prisoners' request for modification of that same order. The next day, we issued our opinion reviewing the district court's August 1991 determination that the State and the County had acted with deliberate indifference to the constitutional rights of felons in the jails. See Alberti v. Sheriff of Harris County, 978 F.2d 893 (5th Cir.1992) (Alberti II ), cert. denied, --- U.S. ----, 113 S.Ct. 2996, 125 L.Ed.2d 690 (1993).
 
 
 37
 We affirmed the district court's determination that the State was deliberately indifferent. Id. at 895. Similarly, while we noted that the fact that the County faced " 'arguably formidable constraints' ... including the dramatic increase in the number of [transfer-ready] felons being kept the county jail, largely beyond the county's control to prevent" made the question of whether the County acted with deliberate indifference more difficult, we nevertheless affirmed the district court's finding that the County also acted with deliberate indifference. Id. at 896. We commented that "[t]he district judge was intimately familiar with the push and shove of state government and its response to sorry prison conditions. The trial judge was uniquely informed of the county 'mental state' and we decline to upset it." Id. at 896.
 
 
 38
 We also addressed the County's contention that the district court abused its discretion by placing a cap on inmate population, because, according to the County, that was the most intrusive remedy and therefore violated the dictates of Ruiz v. Estelle, 679 F.2d 1115, 1144 (5th Cir.), amended in part, vacated in part, 688 F.2d 266 (5th Cir.1982). We roundly rejected this argument, declaring that, "[a] numerical cap on the number of prisoners is not an overly intrusive remedy. It gives the county maximum flexibility in determining on its own how to meet population goals." Alberti II, 978 F.2d at 896.
 
 
 39
 On March 24, 1993, the district court issued an order that among other things, denied the State's "Motion to Modify Final Order or to Stay Imposition of Fines." The State argued that it had made a good-faith effort to meet the population caps imposed in the September 29, 1992 final order and therefore it should not be subjected to the fines set out in that final order. While acknowledging the State's efforts, the court noted that "[t]he current conditions at the Harris County jail are barbaric and cannot be tolerated another eight or nine months. Inmates are sleeping on floors with backed-up sewage, are riding in dangerous elevators, and are being exposed to tuberculosis and other diseases."
 
 
 40
 The court reasoned that "[b]ecause of the egregious conditions caused by the drastic overcrowding, caused in turn by the State's inability to accept its own prisoners ... the Court cannot and will not modify or stay the March 31, 1993 deadline." The court did, however, alter one portion of the September 29, 1992 order, "clarifying" that "the provision in the September 29 order relating to a 'fine' is more properly described as a sanction to be paid into the Court's Registry for appropriate use pursuant to orders of this Court to alleviate, as much as possible given the extreme overcrowding, the conditions at the Harris County facilities." A little more than two weeks later, on April 7, 1993, the district court entered an order to "implement the sanctions provisions of the September 29, 1992 Final Order."
 
 
 41
 The State then appealed the district court's September 29, 1992 order, the March 24, 1993 order, and the April 7, 1993 order. The plaintiff-prisoners cross-appealed, and so we come to Alberti III. The State contends that the district court erred in requiring the State to pay what it characterizes as "anticipatory contempt fines" without a hearing. The State also argues that the district court abused its discretion by establishing the constitutional capacity of the jails without a hearing. Next, the State asserts that the district court erred in its allocation of the costs of the monitors, of the fines, and of the joint remedial plan between the County and the State. Finally, in the alternative, the State argues that we should certify the question of the respective responsibilities of the State and the County to the Texas Supreme Court to conform the allocation of responsibility between the State and the County to state law. The plaintiff-prisoners cross-appeal, arguing that the district court improperly modified the 1975 consent judgment and other subsequent orders.
 
 II. STANDARDS OF REVIEW
 
 42
 We review the imposition of sanctions for an abuse of discretion. Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297, 1303 (11th Cir.1991). Similarly, we have noted that the district courts have broad discretion in taxing costs of court, and we will reverse only upon a clear showing of abuse of discretion. Sidag Aktiengesellschaft v. Smoked Foods Prods. Co., 854 F.2d 799, 801-02 (5th Cir.1988); see also In re Hunt, 754 F.2d 1290, 1294 (5th Cir.1985). We use the same standard to examine a district court's decision whether to hold an evidentiary hearing. Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 527 (1st Cir.1991) ("Normally, we review the decision not to convene an evidentiary hearing only for abuse of discretion.").
 
 III. DISCUSSION
 A. Jurisdiction
 
 43
 First, the State maintains that the district court lacked jurisdiction to assess the sanctions because of the pendency of Alberti II in this court. This argument is without merit. Although notice of appeal typically divests the district court of jurisdiction, "a district court maintains jurisdiction as to matters not involved in the appeal...." Farmhand, Inc. v. Anel Eng'g Indus., 693 F.2d 1140, 1145 (5th Cir.1982). Additionally, we have stated that "[t]he district court maintains jurisdiction for other matters, such as ordering stays or modifying injunctive relief." Id. at 1146. Finally, "we have recognized the continuing jurisdiction of the district court in support of its judgment, as long as that judgment has not been superseded." Id. Accordingly, "[u]ntil the judgment has been properly stayed or superseded, the district court may enforce it through contempt sanctions." United States v. Revie, 834 F.2d 1198, 1205 (5th Cir.1987), cert. denied, 487 U.S. 1205, 108 S.Ct. 2845, 101 L.Ed.2d 882 (1988).
 
 
 44
 In the instant case, we specifically denied the State's motion for a stay in the district court during the pendency of the Alberti II appeal. Alberti v. The Sheriff of Harris County, Nos. 90-2441, 90-6034, 91-2210, 91-2274, slip op. (5th Cir. Aug. 9, 1991). The district court retained jurisdiction to enforce its judgment that the State was primarily responsible for the unconstitutional conditions in the county jails. See Revie, 834 F.2d at 1205; Farmhand, 693 F.2d at 1146.
 
 B. Assessment of the Sanctions
 
 45
 The State also argues that the district court violated the State's due process rights by issuing a contempt finding without affording the State a hearing. The State contends that the fines included in the September 29 final order are in essence "anticipatory contempt findings" imposed without a show-cause hearing and therefore violate due process and the Eleventh Amendment. Finding that the State received all of the process it was due, we reject the State's argument.
 
 
 46
 The characterization of the contingent payments ordered by the court affects the procedures required for their implementation. The district court initially characterized its $50 per inmate charge as a fine. Later, on March 24, 1993, the court "clarified" its order, describing the $50 charge as a remedial sanction. The County and the plaintiff-prisoners argue that the district court's "clarification" illustrates that the penalty for violating the cap is remedial. Thus, the County and the plaintiff-prisoners conclude that the State has "not been ordered to pay money because they violated a federal court order; they have simply been directed to provide funds to alleviate unconstitutional conditions caused by their failure to reduce populations to constitutionally acceptable levels."
 
 
 47
 To determine the character of the sanction imposed by the court, we must examine the nature of the court's actions. See United Mine Workers v. Bagwell, --- U.S. ----, ----, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994) (noting that in the contempt context, "the stated purposes of the sanction ... cannot be determinative" and commenting that the nature of a sanction is "properly drawn, not from the subjective intent of the ... court[ ], but from an examination of the character of the relief itself." (internal quotation omitted)).
 
 
 48
 The Supreme Court recently noted that, "the paradigmatic civil contempt sanction order ... involves confining a contemnor indefinitely until he complies with an affirmative command such as an order 'to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance.' " Bagwell, --- U.S. at ----, 114 S.Ct. at 2557 (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 442, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911)). The Court then described the closest analogy to that paradigm civil contempt situation--"a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order." Id. That is precisely what happened in the instant case.
 
 
 49
 Although the court did not specifically describe its fines as contempt sanctions, the monetary penalties in the order accrue only to the extent that the court-ordered population caps are exceeded. Thus, the court order mandates a maximum inmate population and imposes a fine if that order is violated.
 
 
 50
 The fact that the fines are not to be paid to the court, but are remedial in nature, does not undermine the conclusion that the sanctions are for contempt. In fact, "a contempt sanction is considered civil if it 'is remedial and for the benefit of the complainant....' " Id. (quoting Gompers, 221 U.S. at 498, 31 S.Ct. at 628); see also Lamar Fin. Corp. v. Adams, 918 F.2d 564, 566 (5th Cir.1990) (noting that a sanction is civil contempt "[i]f the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation"); Petroleos Mexicanos v. Crawford Enters., 826 F.2d 392, 399 (5th Cir.1987) ("[S]anctions for civil contempt are meant to be 'wholly remedial' and serve to benefit the party who has suffered injury or loss at the hands of the contemnor").
 
 
 51
 The nature of the contempt guides the proceedings which are required before a court can issue sanctions. Civil contempt sanctions "are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." Bagwell, --- U.S. at ----, 114 S.Ct. at 2557; see also id. --- U.S. at ----, 114 S.Ct. at 2559 (noting that "because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required").
 
 
 52
 In the instant case, after reviewing the pleadings and hearing oral argument, the district court, on March 24, 1993, entered an order rejecting, inter alia, the State's motion to modify the final order and to stay the imposition of fines. Prior to entering that order, the district court heard the State's contentions that the court should stay the fine, but found the State's reasons inadequate. This hearing took place before the March 31, 1993 deadline for the reduction in prison population, and only after this hearing did the sanctions take effect. This afforded the State adequate notice and opportunity to be heard.
 
 
 53
 The Eleventh Circuit's decision in Mercer v. Mitchell, 908 F.2d 763 (11th Cir.1990), does not militate against this conclusion. In that case, without conducting any hearing, the district court noted that "it [would] accept no excuses for not complying with its cap" and "directed the parties to submit a statement to the court indicating the number of prisoners held in violation of the cap." Id. at 766. The Mercer court found that this deprived the defendant county of its due process rights. Specifically, the court described the typical proceeding satisfying the requirements of due process:
 
 
 54
 [T]he defendant is allowed to show either that he did not violate the court order or that he was excused from complying. Typically, a defendant will argue that he should not be held in contempt because changed circumstances would make strict enforcement of the order unjust. In such a case, the defendant should move the court to modify the order, and the hearing on the show-cause order would take on the appearance of a hearing on a motion to modify an injunction. If the court determines that the order should be modified and that the defendant's conduct did not violate the order as modified, then ordinarily it would be unjust to hold the defendant in contempt. If, however, the court concludes that the order should not be modified and that the defendant did not comply with the order, then the court may hold him in contempt and impose sanctions designed to ensure compliance.
 
 
 55
 Mercer, 908 F.2d at 768 (second emphasis added). In the instant case, the district court conducted a hearing. The court provided the State with an opportunity to explain why it should not be required to adhere to the order and why the order should be modified. The court, however, found the State's contentions inadequate and concluded that no modification of the sanctions was in order. Even under the standard of Mercer, the district court's actions in this case met due process requirements.[10]
 
 C. Allocation of Fines
 
 56
 The State next contends that the district court erred in holding the State solely responsible for paying the sanctions for overcrowding. We reject this argument.
 
 
 57
 As noted above, the district court clearly has the power to assess contempt fines for a violation of its population cap order. See Bagwell, --- U.S. at ---- - ----, 114 S.Ct. at 2257-58; A.W. Thompson, Inc., 651 F.2d at 1145; Schill Steel Prods., 480 F.2d at 599. Here, the district court specifically found that the "majority of the problems ... at the Harris County Facility result from the large number of TDCJ inmates which the State will not receive." The court also noted that "the primary responsibility for the overcrowding crisis in the Harris County Jail Facility lies with the State Defendants who have the power and the ability through legislation to act to resolve the situation. The State has declined to do so." In light of these determinations, the district court did not abuse its discretion by concluding that it could ensure compliance with its order by fining the State for overcrowding. The fact that the Court did not identically fine the County to ensure its compliance with the court order does not indicate an abuse of discretion.[11]
 
 
 58
 The State next argues that the allocation of the fines is erroneous because it ignores the relative responsibilities of the County and the State for the prisons under state law. We find this argument to be without merit.
 
 
 59
 In Alberti I, we noted that, "the state courts should eventually determine whether the state or the county is responsible for [transfer-ready felons] in the county's jails." Alberti I, 937 F.2d at 1002. Nevertheless, we agreed with the district court that "the fact that the State of Texas has virtually complete freedom to decide who will be responsible for the confinement of felons provides no shield for liability for the State Defendants in this case because state law clearly places primary responsibility for the confinement of felons upon them." Id. at 997.
 
 
 60
 Moreover, in denying the State's petition for prohibition, stay, and rehearing, we rejected the State's contention that "the legislature, by enacting H.B. 93, and the parties by their settlement agreement, ha[d] changed the legal relationship between the state and the counties" in any way that affected our finding in Alberti I. Thus, we refused to upset our affirmance of the district court's conclusion that the State had a responsibility for transfer-ready felons in county jails. Similarly, in Alberti II, we were unpersuaded by the State's argument that under Texas law, it was not responsible for transfer-ready felons. Alberti II, 978 F.2d at 895 (rejecting the contention that the State's responsibility for the care of felons in the county jails had become uncertain "in light of rulings by the Ruiz court and legislation proposed by the Texas legislature; both signal[ing] that prisoners who are ready for transfer to TDC remain the responsibility of the county until their transfer to TDC.").
 
 
 61
 Simply, current Texas law does not affect the State's liability for the unconstitutional conditions directly attributable to the State's refusal to accept transfer-ready felons. The district court, after dealing with this case for two decades, determined the most appropriate methods for ensuring that the jails meet constitutional standards. In assessing sanctions against the State to meet this goal, the court did not abuse its discretion.
 
 
 62
 Finally, we reject the State's invitation to certify the question of the relative responsibilities of the County and the State to the Texas Supreme Court. Under Texas Rule of Appellate Procedure 114(a), a question of law can be certified to the Supreme Court of Texas " 'if it appears to the certifying court that there is no controlling precedent in the decisions of the Supreme Court of Texas.' " Lucas v. United States, 807 F.2d 414, 418 (5th Cir.1986) (quoting Tex.R.App.P. 114(a)); accord Swearingen v. Owens-Corning Fiberglas Corp., 968 F.2d 559, 564 (5th Cir.1992). We have also noted, however, that "[c]ertification does not constitute a panacea for resolution of those complex or difficult decisions of state law which have not been answered by the highest court of the state." Swearingen, 968 F.2d at 564 (internal quotation and citation omitted).
 
 
 63
 In this case, although the Texas Supreme Court has not passed on the relative responsibilities of the State and the County regarding conditions of overcrowding caused by the State's refusal to accept transfer-ready felons, we have previously held that, "we are not persuaded that the state's duty [in regard to the problems of the jails is] so uncertain." Alberti II, 978 F.2d at 895. Moreover, we have repeatedly rejected the State's contention that state law absolves the State of all of its responsibility for transfer-ready felons. Accordingly, we reject the State's invitation to certify this question to the Texas Supreme Court.
 
 
 64
 D. Allocation of the Costs of the Joint Remedial Plan
 
 
 65
 The State also argues that the district court erred by requiring the State to fund all of the costs of the joint remedial plan except for those costs "falling within the traditional role of County detention facilities." Specifically, the State contends that the court: (1) "should not have imposed a remedy at odds with the statutes implementing the settlement agreements in the state court lawsuits"; and (2) should not have "specifically requir[ed] [the] State defendants to fund the creation of alternatives to incarceration in Harris County." We reject both of these arguments.
 
 
 66
 The State's first contention is disposed of easily. As noted above, we have found, on multiple occasions, that neither state law nor the state court settlement agreement affects the State's liability for the unconstitutional conditions in the Harris County jails caused by the State's refusal to accept transfer-ready felons. In prior proceedings of this case, we have held that state law imposes a responsibility on the State for those transfer ready-felons, and we have affirmed the district court's findings that the State acted with conscious disregard in shirking that responsibility. Consequently, we also have affirmed the district court's findings that the State was liable--the settlement agreement and state law notwithstanding--for the unconstitutional conditions that it helped to create and to maintain in the county jails. We find no error in the court's conclusion that the "primary responsibility [for the unconstitutional prison conditions], and therefore the primary financial burden [to alleviate those conditions], falls on the state." See Alberti I, 937 F.2d at 997 (upholding the district court's determination that "State law clearly places the primary responsibility for the confinement of felons" on the state).
 
 
 67
 As to the State's second argument, we disagree with the contention that the district court's order allocating the costs of the joint plan improperly infringed upon the State's ability to manage its prisons. Cf. Ruiz, 679 F.2d at 1148 (finding that a court order mandating the use of specific programs to relieve overcrowding in state prisons "unnecessarily invade[d] the management responsibility of state officials"). The district court did not mandate programs for the State to institute; instead, it merely required that the State pay for programs which the State itself, in conjunction with the County, developed as part of the joint remedial plan to correct the overcrowding situation in the county jails. This did not constitute an abuse of discretion.
 
 
 68
 The district court order requires the State to fund programs to relieve the overcrowding for which it is in part responsible. In earlier proceedings in this case, we rejected the State's argument that the district court is forbidden from ordering monetary relief; we stated in Alberti I that "the plaintiffs established a federal constitutional violation, and the state is a responsible party. The required payments are thus 'a necessary consequence of compliance in the future with a substantive federal question determination.' " Alberti I, 937 F.2d at 1001 (quoting Edelman v. Jordan, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974)). The order in this case is similar.
 
 
 69
 The district court found that the State's actions were the primary cause of the constitutional violations at the county jail. The court also noted that without state-funded action, the constitutional violations would continue.[12] Because the payments are to ensure that the State's future treatment of transfer-ready felons is constitutional, the district court's order regarding the funding of the joint remedial plan is well within the power of the district court and the contours of the Constitution. See id.; Edelman, 415 U.S. at 664-68, 94 S.Ct. at 1356-58.
 
 E. Allocation of the Costs of the Monitors
 
 70
 The State next avers that the district court improperly taxed the State for ninety percent of the costs of the monitors. We also reject this contention.
 
 
 71
 The guidelines for compensation of special masters (or referees, auditors, examiners, and assessors) is set forth in Federal Rule of Civil Procedure 53(a). This Rule provides, in part, that, "[t]he compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties ... as the court may direct...." Fed.R.Civ.P. 53(a).
 
 
 72
 The State first contends that it cannot "be assessed any of the monitors' costs as costs of court because [the] Monitors w[ere] appointed solely to deal with issues arising from the suit between the County and the Plaintiffs...." This position is insupportable. Perceiving the effect of the State's actions on the jails as early as December of 1987, the district court altered the charge of the monitors. At that time, the court issued an order stating that "in view of the sudden and sharp increase in the population of the Harris County Jail due in part to the imposition of population quotas by the [TDC], the Monitors shall review the cause(s) of the overcrowding and assess its impact [on the jails]." Thus, by the end of 1987, the monitors were evaluating the impact of the State's actions on the county jails. See Alberti I, 937 F.2d at 987.
 
 
 73
 Although the monitors were specifically instructed to determine the effect of State action as early as December of 1987, the court did not charge the State for any of the monitors' expenses incurred before the State became a party to the lawsuit. The State was joined as a party to the lawsuit in January of 1989, see id., and the district court's final order taxed the State for ninety percent of the monitors' fees incurred from February 1, 1989.
 
 
 74
 The State asserts that because it is asked to reimburse the County for fees that the County has already paid to the monitors, the State is actually being required "to pay damages to the County in violation of the Eleventh Amendment." This is simply a misstatement of the law. We have held that:
 
 
 75
 an assessment of costs against the state is not prohibited by the state's Eleventh Amendment immunity. Moneys paid for a special master are included in the recoverable costs under Rule 54(d) of the Federal Rules of Civil Procedure; a district court does not abuse its discretion by taxing the losing party with the full share of the Special Master's fee.
 
 
 76
 Gary W. v. Louisiana, 601 F.2d 240, 246 (5th Cir.1979).
 
 
 77
 The district court determined that the actions of the State were the primary cause of the overcrowding plaguing the county's jails. It is this overcrowding that in large part necessitated the monitors' presence. We find no authority, and the State cites none, for the proposition that the district court abused its discretion by holding the State responsible for ninety percent of the costs of the monitors for the time period after the State entered the litigation.[13]
 
 
 78
 F. The Termination of the Consent Decree and All Prior Orders
 
 
 79
 On cross-appeal the plaintiff-prisoners argue that the district court erred: (1) in sua sponte vacating the consent decree and all other remedial orders; and (2) in sua sponte raising the inmate population caps for the jails. Specifically, the prisoners argue that the district court's actions violated the doctrine of the law of the case and the dictates of due process.
 
 
 80
 1. The nature of the February 4, 1975 "Consent Judgment"
 
 
 81
 Initially, we must establish the character of the February 4, 1975 order. The County argues that the consent judgment was not really a consent decree. This contention is without merit. The Supreme Court has described a consent decree as "an agreement between the parties to a case after careful negotiation has produced agreement on [its] precise terms." Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 522, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986) (internal quotation omitted). Moreover, we have noted that "[o]nce the district court enters the settlement as a judicial consent decree ending the lawsuit, the settlement takes on the nature of a judgment." Ho v. Martin Marietta Corp., 845 F.2d 545, 547 (5th Cir.1988); see also 1B James WM. Moore et al., Moore's Federal Practice p 0.409, at III-151 (2d ed. 1993) ("The judgment is not, like the settlement agreement out of which it arose, a mere contract inter partes. The court is not properly a recorder of contracts; it is an organ of government constituted to make judicial decisions, and when it has rendered a consent judgment it has made an adjudication." (emphasis added)).
 
 
 82
 In the instant case, the parties intended to settle the case. The consent judgment specifically states that it was entered only when "the parties being desirous of effecting a just settlement of this action, and a compromise of the claims therein ... ha[d] agreed to the terms of such a settlement." See Alberti v. Sheriff of Harris County, Texas, No. 72-H-1094, slip op. at 1 (S.D.Tex. Feb. 4, 1975). Thus, the entire settlement clearly was entered into with the consent of the parties, notwithstanding the fact that the court required the parties to agree to certain provisions before the court accepted the settlement. Moreover, the settlement, which was signed by the attorneys for the commissioners court, the attorney for the sheriff of Harris County, and the attorneys for the plaintiff-prisoners, was plainly labeled as "CONSENT JUDGMENT." See Alberti v. Sheriff of Harris County, No. 72-H-1094, slip op. at 1 (S.D.Tex. Feb. 4, 1975).
 
 
 83
 The nature of the February 4, 1975 order is also indicated by the court's and the parties' treatment of it. The courts and the parties (until the County's recent position) treated the February 4, 1975 consent judgment as a final judgment in which the district court "retained jurisdiction to issue any and all interim orders necessary for immediate relief in this action until such time and as the terms are complied with by the Defendants Commissioners Court and the Sheriff." Id. (emphasis added); see, e.g., Alberti I, 937 F.2d at 987 ("[T]he district court retained jurisdiction to issue further interim orders."); Alberti v. Heard, 600 F.Supp. 443, 446 (S.D.Tex.1984) (noting that after the consent judgment the district court "retained jurisdiction"); Alberti v. Sheriff of Harris County, 406 F.Supp. 649, 654 (S.D.Tex.1975) ("On February 4, 1975, counsel signed and this Court approved, a Consent Judgment by which defendants generally agreed to bring presently existing facilities and operations into compliance with federal and state standards."). Simply, we are unconvinced that over the past two decades the parties and the courts have misapprehended the nature of the decree.
 
 
 84
 The fact that the "Consent Judgment" was a final judgment on the merits is not undermined by the court's issuance of numerous orders after February 4, 1975. These orders were not "interlocutory orders," as the County asserts; rather, those orders were the very interim orders that the court described as "necessary for immediate relief," and they were fully consistent with the nature of the February 4 order as a consent judgment. As the First Circuit noted, "The entry of a consent decree does not 'kill' a case or terminate the district court's jurisdiction. Rather, when ... an injunction entered pursuant to a consent decree has ongoing effects, the issuing court retains authority to enforce it." In re Pearson, 990 F.2d 653, 657 (1st Cir.1993); see also Ho, 845 F.2d at 548 (noting that a court has continuing jurisdiction over a consent decree); cf. Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 370-79, 112 S.Ct. 748, 754-57, 116 L.Ed.2d 867 (1992) (discussing the district court's orders that were issued subsequent to a consent decree). Clearly, the February 4, 1975 order was--just as it was labeled--a consent judgment.
 
 2. Modification of the Consent Judgment
 
 85
 Given that the February 4, 1975 order was a final judgment on the merits, we now address the propriety of the district court's sua sponte modification of the consent decree. Several circuits have recently examined whether a district court may modify a consent decree on its own initiative. See United States v. City of Miami, 2 F.3d 1497 (11th Cir.1993); In re Pearson, 990 F.2d 653 (1st Cir.1993). Pearson dealt, in part, with the power of a district court to sua sponte appoint a master "to look at possible decree-modifying changes" in the context of a consent decree governing the treatment of patients at a treatment center. The First Circuit noted that a court is intimately involved in a consent decree, "stand[ing] behind the decree, ready to interpret and enforce its provisions. This ongoing supervisory responsibility carries with it a certain correlative discretion." In re Pearson, 990 F.2d at 658. This discretion, the court reasoned, is especially important when "a consent decree calls for judicial supervision of a government-run facility." Id. The court also noted that, in such a case, "notwithstanding the parties silence or inertia, the district court is not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without ever occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest." Id. Given the court's power to supervise its decrees, the First Circuit concluded that the district court acted within its discretion by sua sponte appointing a special master "to ascertain the need for alteration of its ongoing activities under a consent decree." Id. at 659.
 
 
 86
 In City of Miami, the Eleventh Circuit adopted much of the First Circuit's analysis. In a decision regarding a consent decree in the employment discrimination context, the court noted that regardless of whether a decree is entered after litigation or by consent, "a court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." City of Miami, 2 F.3d at 1506 (quoting United States v. Swift, 286 U.S. 106, 114-15, 52 S.Ct. 460, 462-63, 76 L.Ed. 999 (1932)). Then, relying extensively on Pearson, the court concluded that "[w]hen the remedy prescribed in the consent decree has been accomplished[,] a district court does not have to await a party's motion to terminate a decree which requires temporary supervisory jurisdiction of an agreed upon consent decree.... The district court ... is authorized to consider sua sponte whether termination of the consent decree is appropriate." City of Miami, 2 F.3d at 1506.
 
 
 87
 We agree with the reasoning of the First and Eleventh Circuits. There is little question that the district court has wide discretion to interpret and modify a forward-looking consent decree such as that entered in the instant case. As the Supreme Court noted, " 'sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.' " Rufo, 502 U.S. at 380, 112 S.Ct. at 758 (quoting System Fed'n No. 91, Railway Employes' Dep't v. Wright, 364 U.S. 642, 647-48, 81 S.Ct. 368, 371-72, 5 L.Ed.2d 349 (1961)). Concomitant with that discretion is the ability for a court, regardless of the parties' silence or inertia, to modify a decree when the court sees that the factual circumstances or the law underlying that decree has changed.
 
 
 88
 While a court has the power to modify a consent decree, that power is not unfettered. The Supreme Court recently described the analysis for determining when a modification to a consent decree is warranted. In Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Court noted that while a consent judgment "embodies an agreement of the parties and thus in some respects is contractual in nature," such a judgment is still "an agreement that the parties desire and expect will be reflected in and be enforceable as a judicial decree that is subject to the rules generally applicable to other judgments and decrees." Rufo, 502 U.S. at 378, 112 S.Ct. at 757. Thus, the Court reasoned that modification of a consent decree is governed by the same standards that govern modifications of judgments as set forth in Federal Rule of Civil Procedure 60(b).[14] Id. at 379-81, 112 S.Ct. at 758.
 
 
 89
 Additionally, the Court clarified the standard that district courts should use when considering whether a modification of a consent decree is warranted. The Court rejected the notion that only a showing of a " 'grievous wrong evoked by unforeseen conditions' " mandates a change in a consent decree. Id. at 377, 112 S.Ct. at 757-58 (quoting Swift, 286 U.S. at 119, 52 S.Ct. at 464); see also City of Miami, 2 F.3d at 1503-04 (noting the Supreme Court's rejection of the "grievous wrong" standard). The Court observed that:
 
 
 90
 [t]he upsurge in institutional reform litigation since Brown v. Board of Education, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954), has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in effect for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased.
 
 
 91
 Rufo, 502 U.S. at 380, 112 S.Ct. at 758. The Court also noted that "[t]he experience of the district and circuit courts in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of reform litigation." Id. Accordingly, the Court described the flexible standard to be used in determining whether an institutional reform consent decree should be modified, stating that such modification should occur when it is established that "a significant change in circumstances warrants revision of the decree." Id. at 383, 112 S.Ct. at 760; accord City of Miami, 2 F.3d at 1503-04. Additionally, when the modification relates to the vindication of a constitutional right, the modification must be "suitably tailored to the changed circumstance." Rufo, 502 U.S. at 383, 112 S.Ct. at 760; see also id. at 383 n. 7, 393-95, 112 S.Ct. at 760 n. 7, 765.
 
 
 92
 In the instant case, the monitors entered proposed findings of fact on June 8, 1992, and in the September 29, 1992 final order, the district court adopted the monitors' findings of fact as findings of the court after considering the parties' objections. The monitors found that the County had complied with many of the requirements set out in the consent judgment and in other subsequent orders. The County and the State entered objections to the monitors' findings of fact, but, notably, the plaintiff-prisoners did not file objections to the monitors' findings. In the memorandum opinion accompanying its final order, the district court found that "certain issues covered in the consent decree are now neither necessary nor desirable." Consequently, the court sua sponte "modif[ied] the consent decree to eliminate all issues and requirements," except for those regarding staffing, classification, transportation, medical treatment, ventilation of the Franklin Jail, kitchen facilities, and provision of mattresses.[15]
 
 
 93
 The monitors' findings of fact, which were adopted by the district court, set forth in great detail the changed circumstances of the jail surrounding almost every aspect of the 1975 consent decree and the other subsequent orders. In short, the monitors determined that the County was in compliance with almost all of the provisions of the consent decree except for those that the district court ordered the County to remedy. The district court considered the monitors' findings of fact that detailed the changed circumstances as well as the State's and the County's objections to those findings, and the court implicitly determined that the changes in the jails over the seventeen years of the court's supervision warranted modification of its orders. Moreover, the court's modifications were suitably tailored to the changed circumstances in the jails and did not violate the basic purpose of the decree--ensuring that the County's jails are "maintain[ed] and operat[ed] in a manner consonant with the United State Constitution." Alberti v. Sheriff of Harris County, Texas, No. 72-H-1094, slip op. at 1 (S.D.Tex. Feb. 4, 1975); cf. Rufo, 502 U.S. at 383-85, 112 S.Ct. at 760 (noting that in a modification, "the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances"). Accordingly, we find no error in most of the court's modifications to the consent decree.
 
 
 94
 There are, however, several modifications to the consent judgment and orders which deserve special attention. First, the district court apparently vacated the requirement set out in the 1975 order that "[i]nmates shall be provided with a clean change of clothing every day." Alberti v. Sheriff of Harris County, 406 F.Supp. 649, 677 (S.D.Tex.1975). Although the monitors did not find that the County was in compliance with this order, they did note that some of the inmates received clean clothes daily, and that all inmates received clean clothes at least three times a week. Further, the monitors commented that, in their consideration of all of the conditions of the jails (including the burgeoning population caused by the State's refusal to accept transfer-ready felons), the County's laundry practices were not "unreasonable." Considering the monitors' and the district court's intimate association and knowledge of the jails' conditions, we find that the district court did not err in finding that the changed conditions of the jail warranted modification of the laundry requirement. See Rufo, 502 U.S. at 383-85, 112 S.Ct. at 760 ("Modification of a consent decree may be warranted when changed factual circumstances make compliance with the decree substantially more onerous[,] ... or when a decree proves to be unworkable because of unforeseen circumstances.").
 
 
 95
 Second and third are the portions of the December 1975 order requiring that "weekenders"--those inmates serving time only on the weekends--are not to stay overnight and mandating that the County serve warrants on individuals who do not "appear as directed after having been released on recognizance." Alberti v. Sheriff of Harris County, Texas, 406 F.Supp. 649, 675-76 (S.D.Tex.1975). We find that the district court did not err in its modifications of these provisions. In October of 1987, the monitors reported that the County was in substantial compliance with both of these requirements, and the monitors did not revisit these areas in its June 1992 report. The prisoner-plaintiffs half-heartedly argue that the district court erred in modifying its order, contending that if given "the opportunity to investigate compliance and such confirmed their impression held at the time, plaintiffs probably would have agreed that modification or vacation would have been appropriate." Even assuming that these provisions, which were not part of the consent judgment, must meet the Rufo standards for modification, we find no error in the district court's actions. Based on its experience with the jails and the monitors' reports, the district court implicitly found that the circumstances no longer required that these portions of the order remain in effect. Notably, the plaintiff-prisoners cite no authority for the idea that they must be allowed the opportunity to determine whether circumstances have actually changed, and in fact do not truly dispute that changed circumstances warrant modification or vacation. Given the district court's power to alter its orders and consent decrees in appropriate circumstances, and the undisputed notion that the circumstances have changed, we reject the notion that the district court erred in modifying its orders regarding "weekenders" and service of warrants on individuals who do not appear after release on recognizance.
 
 
 96
 There is, however, one major modification to the consent decree for which there is insufficient evidence of changed circumstances.[16] The district court modified the constitutional capacity of three of the county jails. As we noted above, while the district court, particularly when it is so intimately involved in institutional reform litigation, may alter a consent decree upon a showing of a significant change of circumstance, before such a modification is made, there must be such a showing. See Rufo, 502 U.S. at 383-85, 112 S.Ct. at 760. In regard to the district court's findings that the constitutional capacity of the jails is 112.5% of design capacity, there is nothing in the monitors' report or in the record to indicate that such a modification in the cap for all of the jails is warranted by a substantial change in circumstances. For one of the facilities, the new San Jacinto jail, the monitors recommended, in findings and recommendations entered on June 2, 1992, that the cap be raised to 112.5% of design capacity. The district court reviewed the monitors' findings and recommendations and the parties' response to those findings and recommendations, and found as "both a finding of fact and a conclusion of law that the constitutional capacity of the [new San Jacinto jail]" was 112.5% of design capacity.[17] There are no findings by the monitors of changed circumstances in the other county facilities. On the contrary, the monitors' report is filled with references to the problems caused by overcrowding, and does not indicate that the County can constitutionally house additional prisoners. The district court is not wedded to the monitors' findings, but without something to indicate that there has been a substantial change in circumstances or in the applicable law (an indication not given in the findings of fact adopted by the court), the district court may not alter the caps. Of course, this does not mean that the district court is precluded from increasing or decreasing the population caps as circumstances warrant. Instead, we merely note that before such modification is made, the district court must find a substantial change in circumstances.
 
 IV. CONCLUSION
 
 97
 For the foregoing reasons, the decision of the district court, except to the extent that the "final order" modifies the district court's prior orders regarding the population caps of the old San Jacinto jail, the Humble detention center and the Franklin Jail, and the provision of jail rules, is AFFIRMED. As to the district court's modifications in those two areas, we REVERSE. Costs are to be borne by the State.
 
 
 
 *
 District Judge of the Southern District of Texas, sitting by designation
 
 
 [1]
 Under the law of the case doctrine, we follow the prior decisions in a case as the law of that case. Thus, we will not reexamine issues of law addressed by a prior panel opinion in a subsequent appeal of the same case unless: "(i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice." North Mississippi Communications v. Jones, 951 F.2d 652, 656 (5th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 184, 121 L.Ed.2d 129 (1992). Additionally, the doctrine extends to those issues "decided by necessary implication as well as those decided explicitly." Dickinson v. Auto Center Mfg. Co., 733 F.2d 1092, 1098 (5th Cir.1983)
 
 
 [2]
 A full recitation of the facts relating to this case is included in two of our earlier opinions, Alberti v. Sheriff of Harris County, 937 F.2d 984, 986-92 (5th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992), and In re Clements, 881 F.2d 145 (5th Cir.1989)
 
 
 [3]
 As we noted in Alberti I, the monitors described a grim situation in the County's jails:
 All systems are impossibly stressed, including food service, programming, elevators, recreation, classification, maintenance, visiting, supplies of clothing and bedding, security, medical care, and mental health services. So far these stressed systems have not broken down completely under the population pressures, but the Monitors believe that there is no elasticity left in the institution and its service systems.
 Alberti I, 937 F.2d at 988.
 
 
 [4]
 The County brought suit against the governor of Texas, the director of the Texas Department of Corrections, and the Texas Department of Corrections' governing board. All officials were sued in their official capacities. In re Clements, 881 F.2d at 148
 
 
 [5]
 This fourth remedial order, unlike the previous three, was issued solely by the Alberti court. Judge Justice, who was presiding over the state prison Ruiz case, wrote separately to " 'clarify [his] relationship to the relief set forth.' " Id. at 992. Judge Justice, while conceding that the order was within the scope of the Alberti case, "suggested that the requirement that the state deposit $750,000 'seemingly falls within the purview of Ruiz....' " Id. Nevertheless, Judge Justice stated that he would "abstain from deciding whether, under Texas law, the state was obligated to pay costs incurred by the county in housing [transfer-ready] felons in other counties' facilities." Id
 
 
 [6]
 We did note, however, that this holding was contingent, to some degree, on the state law in the area, noting that:
 [T]he state courts should eventually determine whether the state or the county is responsible for [transfer-ready] felons in the county jails. The Alberti court's assessment of costs was "tentative" and "contingent on ... the outcome of the pending litigation in State courts over the allocation of costs for maintaining felons ready for transfer to the TDCJ-ID in county facilities." The issue, then, is whether the state or the county should pay for the housing of [transfer-ready] felons in other county jails pending the resolution of state litigation. If the state is found liable on remand, plaintiffs are entitled to their long awaited remedy.
 Alberti I, 937 F.2d at 1002. The state courts never reached a decision, however, because the litigation ended with a settlement agreement.
 
 
 [7]
 We also stayed several district court orders that were included in the appeal, pending the district court's findings of deliberate indifference. We provided, however, that the stay would vacate automatically if the district court found that the State was deliberately indifferent. Alberti I, 937 F.2d at 1004
 
 
 [8]
 The order required the county, at its own expense, to submit a plan, including funding and scheduling, that meets the staffing, the classification, the security, the transportation, and the "other needs of all the County's detention facilities." The county was also directed to submit a comprehensive medical plan as well as a plan, including funding and scheduling, for repair of the Franklin jail ventilation system. Additionally, the court ordered the county to submit, within thirty days, evidence that each inmate had a mattress, and the court imposed a "fine of $50 per day per inmate ... for each inmate having to sleep on the floor without a mattress." Finally, the County was commanded to remedy certain kitchen deficiencies
 
 
 [9]
 Specifically, the court set population caps of 4500 inmates for the new San Jacinto jail, 3950 inmates for the Franklin jail, 475 inmates at the old San Jacinto Jail, and 875 inmates at the Humble detention center
 
 
 [10]
 The state also maintains that the fines imposed in this case are "anticipatory contempt fines" and per se violative of due process. This contention is without merit. As noted above, the Supreme Court recently described per diem fines as "a close analogy" to the paradigmatic coercive, civil contempt sanction--confinement contingent upon compliance of a court order. Bagwell, --- U.S. at ---- - ----, 114 S.Ct. at 2257-58. In the subject case, the fines imposed by the court are to be assessed for each day the court order is violated. They do not violate due process, particularly in light of the hearing afforded to the state. Cf. NLRB v. A.W. Thompson, Inc., 651 F.2d 1141, 1145 (5th Cir.1981) (describing how after repeated violations of an order "we would normally have no qualms about imposing a schedule of prospective fines"); NLRB v. Schill Steel Prods., Inc., 480 F.2d 586, 599 (5th Cir.1973) (imposing a "compliance fine against the Company of $5,000.00 for each day and every violation of the [court's order], and a further compliance fine of $1,000.00 per day for each and every day each such violation [of the Court's order] continues".)
 
 
 [11]
 Contrary to the State's assertions, the County does have some responsibility for ensuring the constitutionality of the conditions of the jails. As noted above, the district court's September 29, 1992 order specifically required the county to undertake specific action at the jails, and imposed daily fines if those actions were not taken
 
 
 [12]
 In a memorandum opinion entered contemporaneously with its September 29, 1992 final order, the district court stated that:
 [T]he County Defendants were approaching compliance with the orders of this Court until the State Defendants abdicated their responsibility for receiving convicted felons, leaving the inmates in the county jails indefinitely. It was at this point the prison population began to soar.
 This conduct on the part of the State will continue to result in unconstitutional overcrowding unless the State begins to identify, implement and fund necessary changes to its prison system....
 ... [T]he majority of the problems identified by the Monitor at the Harris County facility result from the large number of TDCJ inmates which the State will not receive. For example, the extensive educational and vocational programs recommended by the monitor are not constitutionally required in a traditional County detention facility where inmates are typically released in a relatively short time. Because the conduct of the State Defendants has converted the Harris County Jail into a major facility for convicted felons, such programs become more important.
 
 
 [13]
 Similarly, for the reasons detailed above, we reject the State's contentions that it cannot be liable for the monitors' fees because the "allocation of the Monitors' costs ... runs afoul of the allocation of responsibilities to the state and county actors under current state law."
 
 
 [14]
 Rule 60(b) provides, in part:
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgement, order, or proceeding for the following reasons ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it was based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment....
 Fed.R.Civ.P. 60(b).
 
 
 [15]
 Specifically, the district court noted that:
 The County defendants shall at their own expense ...:
 (a) Submit ... a plan that will either bring the county Defendants into full compliance with the 9-9-7 provision of the Consent decree or provide, through some alternative plan, sufficient staff to meet the security, the classification, transportation, and other needs of the County's detention facilities, such plan to include funding arrangements and a schedule for implementation; and
 (b) Submit ... a comprehensive written medical plan; and
 (c) Submit ... a written plan for the immediate repair of the Central Jail ventilation system; and
 (d) Submit ... evidence that the County Defendants have an adequate number of mattresses such that each inmate is provided with a mattress; ... and
 (e) Submit ... evidence that the kitchen equipment deficiencies described in the findings of fact have been remedied.
 We understand, and the parties do not dispute, that this order keeps many of the provisions intact. Thus, the County is, inter alia, still obligated: to comply with constitutional and state standards for maintaining the jails; to comply with prior staffing orders; to provide adequate medical and dental care (including proper screening and housing of persons suspected of insanity or drug and alcohol abusers in withdrawal); to separate pre-trial detainees; and to comply with the rounding requirements.
 
 
 [16]
 There is also one minor modification to the consent decree that lacks sufficient evidence of changed circumstances. The district court found that copies of jail rules and regulations should be provided to prisoners in both English and Spanish. On that issue, the monitors noted that:
 [i]n their last inspection of the Central Jail, the Monitors found that the [county] defendants had run out of both English and Spanish-language inmate handbooks.... Even when handbooks are available they are not always distributed to new inmates, and, on several occasions, the [M]onitors have observed new arrivals being taken to the floors without having received one.
 The [county] defendants are not in compliance with the Consent Decree relative to the distribution of bilingual rule books and the posting of rules.
 Because there is nothing in the record to indicate a substantial change in circumstances that would warrant a change in this portion of the consent decree, we reverse the final order to the extent that the final order vacated this portion of the consent decree.
 
 
 [17]
 The parties do not appeal this determination