# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1048
No. 00-1288

_____

| | | |
|---|---|---|
| Chinyere Jenkins, by her next friend, Joi Jenkins; Nicholas Paul Winchester-Rabelier, by his next friend, Paula Winchester; Margo Vaughn-Bey, by her next friend, Franklin Vaughn-Bey; Nicholas C. Light, by his next friend, Marian Light; Stephon D. Jackson, by his next friend, B. J. Jones; Travis N. Peter, by his next friend, Debora Chadd-Peter; Leland Guess, by his next friend, Sharon Guess, | * * * * * * * * * * * | |
| Plaintiffs - Appellants | * | |
| | * | Appeals from the United States |
| American Federation of Teachers, Local 691, | * * | District Court for the Western District of Missouri. |
| | * | |
| Intervenor - Appellee | * | |
| | * | |
| v. | * | |
| | * | |
| State of Missouri; Mel Carnahan, Governor of the State of Missouri; Bob Holden, Treasurer of the State of Missouri; Missouri State Board of Education; Peter Herschend, Member of the Missouri State Board of Education; Thomas R. Davis, Member of the Missouri State Board of Education; Robert E. Bartman, Commissioner of | * * * * * * * * | |

Education of the State of Missouri; Rice *
Pete Burns, Member of the Missouri *
State Board of Education; Sharon M. *
Williams, Member of the Missouri *
State Board of Education; Betty Preston, *
Member of the Missouri State Board of *
Education; Jacquelline Wellington, *
Member of the Missouri State Board of *
Education; Russell Thompson, Member *
of the Missouri State Board of *
Education, *
                                         *
        Defendants                       *
                                         *
School District of Kansas City;          *
Benjamin Demps, Jr., Superintendent,     *
School District of Kansas City,          *
Missouri; John A. Rios, School Board     *
President; Patricia Kurtz, School Board  *
Member; Lee Barnes, Jr., School Board    *
Member; Lance Loewenstein, School        *
Board Member; Sandy Aguire Mayer,        *
School Board Member; Elma Warrick,       *
School Board Member; Fifi Bliss          *
Weideman, School Board Member,           *
                                         *
        Defendants - Appellees.          *
                            _____

                    Submitted: May 16, 2000

                       Filed: June 15, 2000
                            _____

Before WOLLMAN, Chief Judge, HEANEY, McMILLIAN, RICHARD S. ARNOLD,
JOHN R. GIBSON, BOWMAN, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD
ARNOLD, MURPHY, and BYE, Circuit Judges.

-2-

_____

JOHN R. GIBSON, Circuit Judge.

The Jenkins class, representing the children of the Kansas City, Missouri School District in this school desegregation case, has appealed the district court's order declaring the district unitary and dismissing the case with prejudice. The order followed a hearing set by the court to consider KCMSD's amended motion for equitable relief from a ruling of the Missouri State Board of Education declaring that the accreditation of KCMSD would be withdrawn effective May 1, 2000. After the district court denied KCMSD's motion, it proceeded sua sponte to a discussion of the unitary status of the district and declared the district to be unitary. A panel of this court reversed and remanded, Jenkins v. Missouri, 205 F.3d 361 (8th Cir. 2000), and we granted KCMSD's motion for rehearing en banc. After receiving additional filings from the parties and hearing argument, we reverse and remand.

We need not discuss in detail the long history of the Kansas City school desegregation litigation. After a finding of constitutional violations, years of effort to remedy them, and extended litigation and appeals which we need not catalog, the State of Missouri moved for a declaration of unitary status. On March 27, 1997, Judge Russell Clark, who had presided over the case since its filing, granted the motion in part, but denied it in part. See Jenkins v. Missouri, 959 F. Supp. 1151(W.D.Mo.), aff'd, 122 F.3d 588 (8th Cir. 1997) (Jenkins XIV). In particular, Judge Clark held that twenty-six percent of the achievement gap of ten normalized curve equivalents between KCMSD's black and white students was a vestige of the constitutional violation, and he ordered KCMSD to take reasonable steps to eradicate that vestige within the next three years. Id. at 1157-65, 1179. At the same time, Judge Clark approved a settlement between KCMSD and the State, providing that the State would pay KCMSD $320 million over three years, and in return, would be dismissed from the litigation. Id. at 1180.

On January 28, 1999, the district judge who succeeded Judge Clark to supervision of the case entered an order declaring that the State had paid its obligation under the settlement and dismissing the State from the case. Order of January 28, 1999. The court said that the State must continue to comply with any obligations that it undertook during the course of the lawsuit that were not covered by the agreement and warned the State against taking any action that might prevent KCMSD from ultimately fulfilling its court-ordered remedial goals. Id. at 6. The court then pointed to Judge Clark's order giving KCMSD three years to eliminate all the remaining vestiges of segregation; the court commented that fifteen months remained on this time line. Id. After considering the "lengthy and litigious process" likely to attend a renewed motion for unitary status, the court directed the parties to prepare for a unitary status hearing to begin on January 3, 2000. Id.

When KCMSD had hired its new superintendent, Benjamin Demps, the district judge, at a hearing on July 19, 1999, told Mr. Demps that a unitary status hearing was set for January 3.

Counsel appeared before the court on August 24, 1999 for a scheduling conference, which the court stated was "to address . . . preparing for a unitary status hearing in January," and in particular, what evidence the parties anticipated presenting in the hearing. Counsel for the class suggested delaying the hearing. He said that it would be difficult for KCMSD to make a case that everything practicable had been done, because there was a "pretty widely shared agreement that this is not the case." Furthermore, some test data were not in, and others seemed to show the achievement gap had not been closed. Nor had KCMSD implemented the curriculum, professional development, and accountability plans designed to close the gap. Also, KCMSD had just hired a new superintendent. The class's counsel suggested a hearing in the late summer of 2000.

The court then pointed to Judge Clark's statement that gave the district three years to eliminate the vestiges of discrimination. The court stated he "believed the Supreme Court when they told me to get this school district returned to local control" and that both he and Judge Clark had given KCMSD three years to comply.

Counsel for the class pointed out that recently the monitoring had been less heavy-handed, and that the monitoring committee, which was commonly referred to as the DMC, had been sending things back to the new superintendent to handle. Counsel said there were many ways the committee could lighten its monitoring. Counsel for the class stated that he did not anticipate that he would be presenting new approaches or anything other than implementation of the five programs already planned for reducing the black-white achievement gap: the curriculum, classroom practices, professional development, assessment, and accountability plans.

The district court then stated that he sensed that both the class and KCMSD were "pretty satisfied that the school district can't . . . go forward with the burden of proof that the gap has narrowed."[1] He said he would need to have a hearing to take testimony from one of the experts who testified at the earlier unitariness hearing and also to hear whether the district was "on track" in implementing the five programs. The court commented that the problem had been the delay in implementation of the five plans to reduce the achievement gap. The court further commented that the track record of the district had not convinced him that KCMSD was putting heart and soul behind implementing the five plans or that KCMSD could get out of the political mode and get into looking after the best interests of the children.

---

[1]This statement came after the following exchange. When the class counsel said in court there was "widely shared agreement" that KCMSD had not done everything practicable to eradicate the achievement gap, KCMSD did not object to this representation. KCMSD's counsel said: "[W]e have a sense at the moment . . . that the district would have an uphill fight in January."

Following this conference, the court filed a written order formally denying the motion for a continuance, stating:

> [T]he Court provided for termination of the [DMC] by March 25, 2000. <u>See</u> Order at 21, Doc. # 4575 (August 21, 1997), . . . . [E]ven if the KCMSD has not attained unitary status, all three Monitors would be removed. <u>See</u> <u>id.</u> At that time, the Court would need to determine the need for new Monitors or even a new remedial structure. <u>Such a determination cannot be made without evidence of the KCMSD's current status.</u>
>
> . . . .
>
> . . . The [unitary status] hearing will begin, as scheduled, on January 3, 2000.

Order of August 26, 1999 at 17-18 (emphasis added).

On October 21, 1999, the State Board of Education voted to withdraw accreditation of KCMSD as of May 1, 2000. In response, KCMSD filed an amended motion for equitable relief on October 25, 1999, seeking to bar the State's action on the ground that it would interfere with the remedial decree in <u>Jenkins</u>.[2] That same day, the court issued an order setting KCMSD's motion for hearing on November 1 to hear evidence on three enumerated issues: whether the court should (1) rejoin the State as a party; (2) declare void ab initio the action of the Missouri State Board of Education in classifying KCMSD as an unaccredited school district; and (3) enjoin the application to KCMSD of several statutes on which the State Board's action was based.

---

[2]In KCMSD's motion for relief from the de-accreditation action, it asked the court to stay the de-accreditation until the five remedial plans had been fully implemented.

The court held the hearing on KCMSD's motion on November 1-2, 1999. We need not discuss in detail the testimony before the court, except to state that it was directed to the issues outlined by the district court in its order of October 25. The parties agreed in oral argument before the panel that the hearing was not a unitary status hearing. At the conclusion of the proceedings of November 2, the court asked KCMSD's staff counsel whether the KCMSD board agreed there should be a unitary status hearing in January. Counsel stated that the board voted unanimously to seek a continuance and authorized her to agree to a continuation of the monitoring committee in its current configuration until the end of the 1999-2000 academic year in June.

On November 9, 1999, KCMSD filed a written motion requesting a continuance of the unitary status hearing set for January 3, 2000, and consenting to continued supervision by the DMC. KCMSD further suggested that it would be appropriate to extend the term limits of the DMC beyond March 25, 2000, and to set a hearing at the end of the academic school year, June 3, 2000, to assess the role of the DMC and consider a reduction in the scope of the oversight by that body in the future.

On November 17 the district court issued an order denying KCMSD's request to rejoin the State as a party and refusing to declare void ab initio the action of the State Board of Education classifying KCMSD as an unaccredited school district.[3] After ruling on the motion before it, the court proceeded sua sponte to consider the issue of whether the district was unitary. In light of the nature of our ruling, it is not necessary that we set out in detail the substance of the court's reasoning. Suffice it to say that, much to the parties' surprise, the court ended by declaring that the KCMSD had achieved unitary status. The court dismissed the case with prejudice.

---

[3]The action of the State Board of Education was effective May 1, 2000. KCMSD has two years in which to regain accreditation and, if it does not, further serious consequences, including dissolution of the district, may follow.

# I.

The issue before us is whether the district court erred in determining KCMSD to be unitary and dismissing the case without taking evidence or hearing arguments.

In January 1999 the court scheduled a hearing on unitary status for January 2000, and both in a conference with counsel and a written order in August 1999 commented specifically on the necessity for a hearing to evaluate what continuing judicial involvement would be required. The order setting the November 1-2, 1999 hearing limited that hearing to the issues of whether the State should be rejoined as a party and whether the de-accreditation order should be declared void ab initio. The transcript discloses that the testimony and evidence at the hearing were directed to these issues. The court's inquiry at the conclusion of the November 1-2 hearing as to whether there should be a unitary status hearing in January demonstrates that the court did not consider it had conducted such a hearing. KCMSD's counsel's response to this inquiry by the court and its written motion filed November 9, 1999 for a continuance of the unitariness hearing demonstrate that KCMSD did not consider that there had been a hearing on unitary status.

It is evident from what we have said above that KCMSD did nothing to contest the Jenkins class's statements that KCMSD was not ready to move forward and establish that KCMSD was unitary, and the judge acknowledged as much. From this and from the court's order limiting the proof at the November 1-2 hearing, the Jenkins class as well as KCMSD went into the hearing with no expectation that unitary status was an issue to be tried.

In Jenkins XIV we held, based upon abundant Supreme Court authority, that once there has been a finding that a defendant established an unlawful dual school system in the past, there is a presumption that current disparities of the sort listed in Green v. County School Board, 391 U.S. 430, 435 (1968), are the result of the defendant's unconstitutional conduct. See Jenkins XIV, 122 F.3d at 593. Therefore, the burden of proving unitariness rests on the constitutional violator. Id. at 593-95. Our statement in Jenkins XIV found support in Freeman v. Pitts, 503 U.S. 467, 494 (1992), where the Supreme Court stated with respect to racial imbalance in student attendance caused by the unlawful policy of a school system, "The School District bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." Other statements in Freeman similarly recognized that the burden was on the district to demonstrate a good faith commitment to compliance with the desegregation plan. Id. at 498-99. This presumption places the burden in any hearing on unitary status on KCMSD, including the issue of reduction in student achievement and the achievement gap. KCMSD admittedly made no attempt to demonstrate that unitary status had been achieved.[4]

---

[4]In Jenkins XIV, we pointed to the finding of the district court in the first remedial order decisions that "the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District." 122 F.3d at 594 (quoting Jenkins v. Missouri, 593 F. Supp. 1485, 1492 (W.D. Mo. 1984)). We also quoted later findings, "Segregation has caused a system wide reduction in student achievement in the schools of the KCMSD. . . . [The] education process has been further 'bogged down' in the KCMSD by a history of segregated education. Too often, as a result, a higher percentage of black students are among the lower achievers." Id. (quoting Jenkins v. Missouri, 639 F. Supp. 19, 24, 28 (W.D. Mo. 1985), aff'd as modified, 807 F.2d 657 (8th Cir. 1986), cert. denied, 484 U.S. 816 (1987)). The district court found that the adverse effect on minority student achievement still persisted in 1997 in the form of an achievement gap; we held that finding was not clearly erroneous. Id. at 597-99.

-9-

This court stated in <u>Booker v. Special School District No. 1</u>, 585 F.2d 347, 352 (8th Cir. 1978), "There is no question that in a proper case a federal district court that has issued an injunction may vacate it or modify it <u>if it is established</u> that to continue it in force or without modification would work an inequitable result." (emphasis added.)

In <u>United States v. Board of School Commissioners</u>, 128 F.3d 507 (7th Cir. 1997), the Seventh Circuit faced a situation nearly identical to the one before us today. There, the Board of School Commissioners of the Indianapolis Public School District requested that the judge lift an injunction requiring busing of public school students on the ground that the district had achieved unitary status.[5] The district court declined to address the issue of unitary status, but modified its existing order by extending the busing to kindergartners, an issue that had not been raised by the parties. The Seventh Circuit, in an opinion by Chief Judge Posner, stated:

> No one asked the judge for this modification; there was no hearing on it. As a result, there is nothing in the judge's order, or in the record on which it is based, about the respective kindergarten programs, facilities, and capacities in the transferor and transferee areas or about the appropriateness of compelling the busing of such young children against their parents' wishes and whether they are to be in the same buses with much older children.

128 F.3d at 512. In support of the court's order that they, like KCMSD here, did not seek in the first place, the appellees pointed out that the district judge had "learned a lot about public school education in Marion County in the thirty years that he has been presiding over this litigation." <u>Id.</u> The Seventh Circuit responded:

---

[5]The Seventh Circuit's opinion stated that a district wanting to phase out a desegregation decree could be permitted to do so only upon presenting evidence that the existing order had outlived its usefulness. <u>See</u> 128 F.3d at 510.

[G]reat knowledge is a temptation as well as a resource:  a temptation to blur the separation of powers, to shift the balance between the federal courts and state and local government too far toward the courts, and to disregard procedural niceties, all in fulfillment of a confident sense of mission.

Id.

Although the Seventh Circuit was dealing with expansion of a remedy and we deal with the elimination of one, the principle is the same:  procedural niceties equate with due process and must be afforded the parties.  As the Seventh Circuit vacated the sua sponte order and remanded for the district court to hold an evidentiary hearing, so should we.

The parties are entitled to notice and an opportunity to prepare for a unitary status hearing.  KCMSD would carry the burden of proof at such a hearing, and the Jenkins class would be entitled to an opportunity to respond.  Due process of law requires no less.  The sua sponte ruling of the district court, in spite of its several earlier orders setting the unitary status hearing some two months later, deprived the Jenkins Class of this constitutional guarantee.

Counsel for KCMSD conceded that the court's ruling was on a ground not argued by the parties, but insisted that the court was thinking ahead of KCMSD.  Having achieved its unexpected release from litigation, KCMSD hastens to give support to the ruling.

KCMSD argues that the district court did not err in declaring KCMSD unitary without benefit of notice, hearing, argument, or other evidentiary presentation.  KCMSD cites Link v. Wabash Railroad Co., 370 U.S. 626 (1962), for the principle that

"Parties are not always entitled to a hearing."  Link has little, if any, relevance to this case.  In Link, the district court set a pretrial conference and notified counsel.  When the lawyer for the plaintiff did not appear at the time set, the court dismissed the action for failure to appear and failure to prosecute.  Id. at 629.  Link did no more than rule that the dismissal for failure to prosecute was not an abuse of discretion.  Id. at 633.

Link is about sanctions, not about what opportunity parties should be given to present evidence and make argument before a ruling on the merits of their case.  It certainly is not about the proper procedure for dismissal of a school desegregation case in which a school district has been adjudged liable for constitutional violations and subjected to a remedial decree.   However, Link does have some general applicability to this case insofar as it discussed the circumstances that can justify entry of an order without the opportunity to be heard:  "The adequacy of notice and hearing respecting proceedings that may affect a party's rights turns, to a considerable extent, on the knowledge which the circumstances show such party may be taken to have of the consequences of his own conduct."  370 U.S. at 332.  Unlike Link, where the attorney had notice of the pretrial conference and should have known that his failure to appear would have consequences, in this case there was no notice to any of the parties, either constitutional violator or victims, that the issue of unitary status was to be considered and decided at the November hearing.  To the contrary, there was every assurance that unitary status would not be considered until the scheduled January 2000 hearing, and KCMSD's requests for continuance strongly suggested that it would not even be in a position to contend that the district was unitary in January 2000.  Link demonstrates that simple fairness requires notice and hearing before a decision that dismisses the case.

At oral argument, KCMSD's counsel suggested that the Jenkins class had the opportunity to present evidence on the unitariness question at the hearing on the class's

motion to stay the dismissal pending appeal. The opportunity to argue a stay motion, with the class having the burden on four discrete issues, which placed the constitutional victims in the position of arguing that the horse should be put back in the barn, does not substitute for a chance to present evidence and argue the merits in a hearing called for the purpose of determining unitariness.

The sua sponte ruling declaring the district unitary and releasing the admitted constitutional violator from further court supervision, without giving notice either to the constitutional violator or the victims or permitting the parties to present evidence and argue these issues, was error.[6]

## II.

The Jenkins class, through its counsel, informed the district court and conceded to this court that the issues in the case had come down to implementation of the five plans (classroom practices, professional development, assessment, accountability and curriculum) crafted to improve student achievement and eliminate the achievement gap between white and black students. Counsel conceded to us, as well as to the district court, that when these five plans have been implemented satisfactorily, he will have no further plans to suggest. The remaining issues have been thus narrowed.

---

[6]The court has not found it necessary today to reach the merits of the district court's order. Both dissents, however, are focused on the merits of the case, and almost exclusively on the 1997 opinions of the district court and this court, Jenkins v. Missouri, 959 F. Supp. 1151 (W.D. Mo.), aff'd,122 F.3d 588 (8th Cir. 1997) (Jenkins XIV). After the decision in Jenkins XIV, none of the parties asked for rehearing or filed a petition for certiorari. The parties before us have not raised the issues discussed in the dissents. Indeed, both parties have accepted Jenkins XIV as the standard under which the unitary status issue must be considered.

The panel ordered that on remand the judges of the Western District of Missouri should assign this case to another district judge. 205 F.3d at 370. KCMSD objects to the reassignment order and argues that it was improperly entered. Eight of the judges of this court have determined that the court should not order reassignment on remand.[7]

We reverse and remand for further proceedings in accordance with this opinion. The mandate shall issue forthwith.


WOLLMAN, Chief Judge, with whom MORRIS SHEPPARD ARNOLD, Circuit Judge, joins, concurring.

I agree with the court that the district court erred in not according the parties the unitary status hearing that had been promised to them. Accordingly, I join in the holding reversing the order appealed from and remanding the case to the district court without reassignment to another district judge.

I write separately only to indicate that I do not wish my agreement with the disposition of the appeal to be read as my endorsement of all that is said within the opinion regarding this court's earlier opinions in this case, or of all that is said regarding what the School District must show to satisfy the district court that it is entitled to a declaration that it has achieved unitary status. For me, it is enough to say that the district court should have given the parties the hearing it had promised them. The court's opinion now assures them of that hearing, which I hope will be held in the reasonably near future. As the court notes, class counsel suggested last August that the unitary status hearing be set in late summer of 2000, and the School District suggested

---

[7]Judges Heaney, McMillian, John R. Gibson, and Bye would order reassignment of the case on remand to another district judge.

-14-

last November that a hearing be set at the end of the 1999-2000 academic year, which will occur on June 3.

Whether the School District will be able to carry its burden of demonstrating that it has achieved unitary status, I do not know. By the time a unitary status hearing is held, the School District will have had a number of months to take further steps towards implementing the several remedial programs since the district court's November 1999 order dismissing the case. What steps the School District has taken during those intervening months may well be a measure of its commitment to its self-proclaimed good-faith efforts to take all practicable steps towards eliminating the provable vestiges of discrimination.

HEANEY, Circuit Judge, with whom McMILLIAN, Circuit Judge, joins, concurring.

I wholly concur in Judge John R. Gibson's well-reasoned opinion. Taking care to stay on the path established by the precedents of the United States Supreme Court and this court, Judge Gibson correctly holds that the students and parents of the KCMSD were denied due process when the district court declared the school district unitary without affording them notice or a hearing. I write separately to express more fully my reasons for agreeing with the majority opinion and to correct the revisionist history painted by Judge Beam's dissent.

The Kansas City schools remained segregated until 1986. In that year, we approved a plan to desegregate them after more than forty-five years of slavery--when the state forbid the education of blacks, see Laws of the State of Missouri, 14th General Assembly, 1st Session at 104 (Jefferson City 1847)--and 120 years of segregation--when public schools for black students were not only separate, but inferior to those for white students, see Brown v. Board of Educ., 349 U.S. 294 (1955). We

believed that if the court-ordered plan was fully and faithfully implemented, white city students who attended private and parochial schools would return to the public school system, and white suburban students would be attracted to integrated magnet schools to be established in the city. Importantly, we also stated that a voluntary interdistrict transfer program similar to that in St. Louis should be implemented in Kansas City.

As a result of the 1986 decrees, the facilities have improved, more books and teaching aids are available, class size has been reduced, remedial and compensatory educational programs have been funded and implemented, and educational opportunities for black and white students alike have improved. Although Kansas City's public schools have improved, they would be better had the State and the KCMSD promptly complied with the Supreme Court's unanimous instruction in 1955 to "desegregate with all deliberate speed," id. at 301, or with the Supreme Court's unanimous opinion in 1968 "that the time for mere deliberate speed has run out . . . . The burden on the school board today is to come forward with a plan that promises realistically to work and promises realistically to work now," Green v. County Sch. Bd., 391 U.S. 430, 438-39 (1968). Moreover, the State and the KCMSD could have ensured further improvement for the schools had they promptly and positively complied with the district court's 1986 desegregation orders.[8]

---

[8]Among the programs approved by the district court and this court were library, teaching load, and curriculum improvements; additional counselors; summer school programs; full-day kindergarten; before and after school tutoring; and early childhood development programs. Also approved were a student achievement program and a class size reduction. The programs were designed to remedy the effects of the dual system and to bring about systematic educational improvements. Jenkins v. Missouri, 807 F.2d 657, 682-83 (8th Cir. 1986) (en banc) (Jenkins I).

The fact is that 165 years of racial discrimination simply could not be overcome in fourteen short years of court supervision, particularly without the full cooperation of the State, the KCMSD, and the suburban schools. Over this period, none of these entities made any effort to implement a voluntary interdistrict transfer program, thus preventing complete integration of the Kansas City schools.[9] Further, the State Board

[9] In <u>Jenkins I</u>, we stated:

A voluntary interdistrict transfer program is one that has great potential for improving the racial balance in the Kansas City area. The experience in St. Louis with such a plan seems to have been favorable. The district court is correct in its holding that such a program cannot be mandatorily imposed upon the record before the court. Whether a refusal of a district to participate in such a voluntary program may evidence discriminatory intent and thus be an independent basis for further relief and mandatory participation is an issue that we should not anticipate.

807 F.2d at 683 n.30. In his concurrence, Judge Arnold stated:

I would hold that the District Court erred in concluding that the SSDs cannot be required to participate in an interdistrict remedy for interdistrict school segregation caused by the State's constitutional violations in the area of housing. The case should be remanded to the District Court for determination of the current interdistrict effects, if any, of the State's housing violations. Any SSDs implicated by this analysis should be obliged to participate in an appropriately tailored interdistrict remedy.

<u>Id.</u> at 687 (Arnold, J., concurring). Furthermore, Judge Ross stated:

At the time of argument it was my understanding that a voluntary interdistrict program, patterned along the lines of the St. Louis program was a real possibility. It would now appear that some of the districts are not moving forward with this plan.

-17-

of Education took no responsibility for the KCMSD's performance, and never once during the fourteen-year period moved to implement the quality education programs called for in Judge Clark's plan. It simply complied with the district court's funding orders. In addition, the constant bickering between the State and the KCMSD and the numerous changes in leadership in the Kansas City schools obviously did not inspire community, parental, or student confidence in the school district.

There is no doubt that the KCMSD currently is faced with more than its fair share of difficulties--difficulties brought on in large measure by the State. Shortly after receiving a judgment declaring that it had satisfied its obligations and being dismissed from this case, the State took two dramatic actions that will impair the KCMSD's ability to provide a quality education for its students. First, it authorized the creation of charter schools in St. Louis and Kansas City, and second, it de-accredited the Kansas City schools effective May 1, 2000 because students have done poorly on student achievement tests.

It is, of course, appropriate for the State to create charter schools, but it is difficult to understand why it authorized the creation of these schools only in the state's two largest cities, both of which enroll a large majority of black students. Additionally, the KCMSD is required to pay the cost of educating and transporting the students who attend these schools. As a result, Kansas City's public schools will have a more

---

In my opinion the failure to organize and implement this program would be a very significant factor in determining discriminatory intent in the future litigation which is certain to result from the further processing of this case. The St. Louis program would be a useful model for the actions to be taken by all the Missouri districts which are parties to this action.

Id. (Ross, J., concurring).

difficult time providing the trained teachers, the educational programs, and the materials necessary to ensure improved achievement of those students, overwhelmingly black, who remain in the public schools.[10]

To make matters worse, the de-accreditation of the KCMSD allows students to attend schools in any other district within the state at the KCMSD's expense. It is noteworthy that the State, which has opposed interdistrict transfers over the past fourteen years, now suddenly approves of such transfers. The only logical explanation for the State's sudden change of heart is that the cost of transfers must now be paid by the KCMSD rather than the State. There is also a serious question as to whether the suburban schools will accept large numbers of Kansas City's black students.

Before concluding, I must take issue with some of the comments in Judge Beam's dissent. First, his assertion that "[s]tudent scores as measured by routine and

---

[10]If the number of Kansas City public school children enrolled in the charter schools remains constant in FY 2001, the KCMSD will be limited to spending $8,240 per pupil unless it is able to raise additional money through local taxation. (J.A. at 1041.) Moreover, witnesses for the KCMSD testified that they expect 3,200 pupils to transfer to other districts at a total cost to the KCMSD of $35,892,000. (J.A. at 1043.) If this number of students transferred, the KCMSD will have just $7,450 per pupil available to educate its remaining 28,000 students. (J.A. at 1045.)

Contrary to Judge Beam's assertion that Kansas City per pupil spending is well above that spent by any other school district in Missouri, the fact is that in the 1998-99 school year, the last year for which statistics are available, several school districts in the State of Missouri expended more per pupil than did the KCMSD, including Brentwood, $8,735; Clayton, $11,239; Ladue, $9,938; and Center, $8,583. See Office of Social and Economic Data Analysis, University of Missouri, <http://www.oseda.missouri.edu/countypage>. Since the 1994-95 school year, KCMSD's per pupil spending has declined by 21%, while per pupil spending in the above-cited school districts increased on average 19.5%. See id.

regularly administered standardized tests have remained static or have declined" is unfounded. From 1987 to 1994, KCMSD student test scores not only improved in most grades, but significantly improved. In 1995, however, the test scores dropped, resulting in those cited by Judge Beam. The reasons for the decline are unexplained in the record and may be explored during the unitary status hearing. Below is a comparison of the test scores from 1988 to 1994.

| Grade | 1987-88 Math | 1993-94 Math | Change | 1987-88 Reading | 1993-94 Reading | Change |
|-------|--------------|--------------|--------|-----------------|-----------------|--------|
| K | 53.4 | 58.6 | 5.2+ | 63.0 | 65.4('90) | 2.4+ |
| 1 | 48.9 | 57.4 | 8.5+ | 45.8 | 49.9 | 4.1+ |
| 2 | 50.6 | 55.3 | 4.7+ | 45.6 | 46.3 | .7+ |
| 3 | 43.4 | 49.5 | 6.1+ | 41.3 | 44.2 | 2.9+ |
| 4 | 46.0 | 49.2 | 3.2+ | 42.6 | 43.5 | .9+ |
| 5 | 43.8 | 50.0 | 6.2+ | 43.1 | 45.4 | 2.3+ |
| 6 | 42.2 | 42.4 | .2+ | 40.6 | 40.6 | 0 |
| 7 | 40.9 | 40.5 | .4- | 42.0 | 42.6 | .6+ |
| 8 | 40.3 | 41.2 | .9+ | 41.7 | 42.9 | 1.2+ |
| | 1989-90 Math | 1993-94 Math | Change | 1989-90 Reading | 1993-94 Reading | Change |
| 9 | 37.7 | 34.3 | 3.4- | 41.4 | 38.3 | 3.1- |
| 10 | 39.7 | 37.8 | 1.9- | 41.8 | 40.0 | 1.8- |
| 11 | 41.2 | 41.8 | .6+ | 41.6 | 41.2 | .4- |
| 12 | 42.0 | 43.7 | 1.7+ | 41.3 | 42.1 | .8+ |

Second, Judge Beam states that KCMSD "students remain as racially isolated as when the first remedial order was entered."  He notes that in 1986 twenty-five schools had a 90%+ minority enrollment, and in 1999, that number had increased to twenty-seven. His statements are misleading.  The number of racially-isolated schools in the KCMSD decreased from twenty-five in 1986 to sixteen in 1996.  See KCMSD Student Census Count (Sept. 25, 1996; Jan. 29, 1997; Sept. 24, 1997; Jan. 28, 1998; Sept. 30, 1998; Jan. 27, 1999).  Only in the past three years has the number of racially-isolated schools jumped from sixteen to twenty-seven, a 69% increase.  Such a substantial increase may indicate that the KCMSD is in the process of resegregating itself.

Third, Judge Beam asserts that $2 billion in tax dollars has been spent since 1985 to fund the plan to desegregate the Kansas City schools.  Accepting the validity of that statement for the purpose of this concurring opinion, I note that over the fourteen-year period, the State and the KCMSD spent an average of $142,800,000 per year or approximately $3,900 per pupil.  Of this sum, Kansas City contributed approximately $417 million or $833 per pupil per year.

This expenditure by the State and the KCMSD to desegregate Kansas City's schools must be viewed in context.  As previously noted, black children were denied any education for forty-five years and were provided an inferior, segregated education for 120 years.  Although the precise dollar amount is not contained in the record, it is clear that both the State and the KCMSD saved hundreds of millions of dollars during the slavery and segregation periods.  The expenditures for desegregation must be balanced against the savings made over 165 years.

Of all the conclusions reached by Judge Beam in his dissent, the most disturbing is that it is beyond the KCMSD's power, with or without the cooperation of the

Missouri State Board of Education, to close the achievement gap between black and white students even to the modest degree required by the district court and now required by this court. The fact of the matter is that achievement levels of Kansas City's black students have improved and will continue to improve as long as the State and the KCMSD understand that it is their responsibility to do everything reasonably practicable to achieve this result.

As the Supreme Court made clear in Board of Educ. v. Dowell, 498 U.S. 237, 247 (1991), withdrawal of federal supervision requires not only compliance with the commands of the Equal Protection Clause, but also a showing "that it [is] unlikely that the Board [will] return to its former ways." Thus to achieve unitary status, the KCMSD must demonstrate not only that it has eliminated racial isolation to the extent practicable, see Missouri v. Jenkins, 515 U.S. 70, 90 (1995), but also that it will maintain those gains when the litigation ends. Absent a unitary status hearing, it could not be determined whether the KCMSD has met these requirements.

No one knows what will occur next, but one thing is certain: Kansas City needs good public schools that offer all students, black or white, rich or poor, a good education. Without a good public school system, all of Kansas City will suffer–the community, the parents, and most of all the students who deserve an education which will enable them to be productive citizens. If the State of Missouri now believes that the KCMSD is not capable of operating the Kansas City schools, it can and should take over the schools and try its hand at giving the students a quality desegregated education. If the State is unwilling to do so–and to this point it has been–it should not penalize the students by dismantling the KCMSD. Rather the State should find a way to work with the KCMSD to improve education and provide the resources necessary to achieve that end.

JOHN R. GIBSON, Circuit Judge, with whom HEANEY and McMILLIAN, Circuit Judges, join, writing separately.

I write separately in concurrence to expand upon the statement that appears in footnote 6 of the court's opinion and to respond to the dissents.

Both dissents argue that the district court failed to follow the ruling of the Supreme Court in Missouri v. Jenkins, 515 U.S. 70 (1995) (Jenkins III). The district court specifically referred to the directions in Jenkins III that it should "decide whether the reduction in achievement by minority students attributable to prior *de jure* segregation has been remedied to [the] extent practicable" and identify the "incremental effect that segregation has had on minority student achievement or the specific goals of the quality education programs." Jenkins v. Missouri, 959 F. Supp. 1151, 1155 (W.D. Mo.) (quoting Jenkins III, 515 U.S. at 101), aff'd, 122 F.3d 588 (8th Cir. 1997) (Jenkins XIV).

Judge Beam asserts that "Jenkins III does not authorize a purported achievement gap as a vestige." Infra at 33. In fact, Jenkins III neither "authorizes" nor forbids reliance on this type of vestige; rather, it tells us to look at the evidence in the case to determine what part of the gap (if any) was caused by the constitutional violation. See 515 U.S. at 101. Judge Clark so found, 959 F. Supp. at 1157-65, and we held his findings were not clearly erroneous. See Jenkins XIV, 122 F.3d at 597-99. Jenkins XIV is thus the law of the case.

Judge Clark's order faithfully followed Jenkins III.

KCMSD does not now ask us to reconsider Jenkins XIV, nor did the present district judge suggest that he was reconsidering it or applying any exception to the law

-23-

of the case doctrine. Further, when the case was before us in 1997, KCMSD sought and supported the ruling that the achievement gap was a vestige of segregation. In its Jenkins XIV brief, KCMSD stated: "KCMSD's expert, whom the court declared credible, established the causal connection between *de jure* segregation and current minority student achievement." Brief at 36. "KCMSD presented substantial evidence that the student achievement vestige continues, consistent with Jenkins III standards." Brief at 35. KCMSD benefitted from the Jenkins XIV ruling, which allowed it to retain the $4.96 tax levy imposed to fund the remedy for the continuing constitutional violation. See 959 F. Supp. at 1154-55. KCMSD, having sought that ruling and having enjoyed the benefits of it, does not now seek to repudiate it.

Judge Loken states that Judge Clark "did not make the critical finding that any achievement gap *among students within the KCMSD* was also a vestige of discrimination with a causal link to the *de jure* violation being remedied." Infra at 46 (internal quotation omitted). Judge Clark stated: "The Court finds that Dr. Trent's test is reliable and accurately identifies the incremental portion [of the achievement gap] attributable to the prior *de jure* discrimination." 959 F. Supp. at 1164. Later, in summing up his findings, Judge Clark wrote: "The Court has found that 13% of the initial gap and 13% of the increase in the gap may be traced to the prior discrimination within the KCMSD." Id. at 1165.

Judge Loken contends that Judge Clark should not have imposed the burden of proof on the constitutional violators to show that the achievement gap was not caused by the constitutional violations. This burden of proof question was fully considered and decided in our 1997 opinion. See Jenkins XIV, 122 F.3d at 593-95. In KCMSD's brief filed with this court in 1997, it argued that "[t]he burden of demonstrating . . . that unitary status exists, rests squarely with the constitutional violator." Brief at 29. Although this argument dealt with the State as a constitutional violator, KCMSD has

-24-

admitted that it is also a constitutional violator and that the burden of proof rests with it. At no point in the proceedings below or in this court has KCMSD taken any position other than that it bears the burden of proof to demonstrate unitary status.

BEAM, Circuit Judge, with whom BOWMAN and LOKEN, Circuit Judges, join, dissenting.

After twenty-three years of federal court supervision, the educational program of the Kansas City Missouri School District (KCMSD) is in shambles. Its students remain as racially isolated as when the first remedial order was entered by the district court on June 14, 1985.[11] Student scores as measured by routine and regularly administered standardized tests have remained static or have declined,[12] and this has

[11]In 1986, the KCMSD had a minority student population of 73.5% with twenty-five schools having greater than 90% minority enrollment. See Jenkins v. School Dist. of Kansas City, Missouri, 73 F. Supp. 2d 1058, 1069 (W.D. Mo. 1999) (Jenkins X). As of January 1999, KCMSD had a minority student population of 81.8% and twenty-seven schools had greater than 90% minority enrollment. See id. However, because the Supreme Court in Missouri v. Jenkins, 515 U.S. 70, 98 (1995) (Jenkins III), eliminated the "desegregative attractiveness" remedial plan, KCMSD could no longer operate its extensive magnet school program nor could it provide transportation for non-resident students. Given what the Supreme Court said it could use as a remedy, and an increase of the minority population of 8.3%, KCMSD has done everything practicable to reduce the racial isolation in the KCMSD and no one has disputed this conclusion in this appeal.

[12]The KCMSD provided the Iowa Test of Basic Skills scores for every grade level beginning in the 1987-88 school year continuing until at least the 1994-95 school year with the exception of kindergarten. I have placed the earliest and most recent scores in table form, noting the change in average test scores over this period.

occurred even though over two-billion tax dollars have been spent since 1985 on the remedial plan alone, with total educational spending averaging more than $9,000 per student per year (in addition to millions of dollars in capital expenditures). I am confident that this average per pupil amount is well above that spent by any other school district in Missouri for the same period.[13] Until 1996, attorneys for the Jenkins class freely roamed the classrooms, hallways and playgrounds monitoring, observing, talking and projecting themselves into the work and educational lives of school principals, faculty, staff and students. Appellants' brief at 5. Until very recently, a Desegregation Monitoring Committee under the direct control of the district court involved itself in the day-to-day activities of the school system. Joint Appendix at 1109-11. Unremarkably, the Office of Superintendent of Schools, the supposed chief executive of the school system, has been a revolving door and once the office was empty for a significant period of time. Jenkins v. Missouri, 959 F. Supp. 1151, 1178 (W.D. Mo. 1997) (Jenkins VIII), aff'd, 122 F.3d 588 (8th Cir. 1997) (Jenkins XIV); Jenkins v. School Dist. of Kansas City, 73 F. Supp. 2d 1058, 1072 (W.D. Mo. 1999) (Jenkins X). Finally, the State has now designated the KCMSD as unaccredited.

---

The Jenkins class provided the Missouri Assessment Program results. The students are placed in one of five categories, and the percentage of students placed in each category for each of the testing years is noted in table form. Both tables are in the addendum to this opinion.

[13]The per pupil expenditures (exclusive of amounts for capital improvements) were as follows: 1993–$8,626; 1994–$9,646, 1995–$10,308; 1996–$9,320; and in 1997–$8,688. Joint Appendix at 971 and 1054. In 1999, for instance, KCMSD had a per pupil expenditure of $8,239. See Missouri Department of Elementary and Secondary Education, 1999 School District Report Card, http://www.dese.state.mo.us/reportsummary/districts/048078.html. In 1999, the average expenditure per pupil in Missouri was $5,925. See id.

-26-

As regrettable and tragic as this situation is, none of the parts in this parade of problems rises to the level of past or present invidious discrimination remediable by a federal court. In short, a school district in shambles is not a constitutional violation.[14]

_____

[14]In his concurrence Judge Heaney contends that I paint a "revisionist history" of this litigation. While I sincerely wish that I could revise the history of this troublesome case, I have not done so. I have, instead, accurately reflected the record that was before Judge Whipple and have amply provided citations that support my statements and conclusions.

Judge Heaney discusses the sordid history of slavery in America, a circumstance we all regret, and discusses the unequal and unlawful dual school system that existed in Missouri prior to 1954. These facts, of course, are relevant, if at all, only to the initial matter of unconstitutional segregation, a holding long since determined and ratified and not now at issue in this or any recent appeal.

Judge Heaney also faults the State of Missouri for its alleged failure to embrace his pedagogical and social vision of how the Kansas City school system should have been operated since 1986, a failure of acceptance shared, at least in part, by many school administrators and other local public officials, parents of students of all races and numerous teachers and their collective bargaining representative. However, as the Supreme Court pointedly noted in Jenkins III, most of Judge Heaney's vision falls well outside of the remedial authority of the federal court in this specific litigation or any other similar litigation for that matter. See generally, 515 U.S. 70. Further, since the State was dismissed from this appeal by Judge Whipple's predecessor in 1997, a decision that was affirmed by this court, Judge Heaney's disapproval is directed toward a non-party and, perhaps, this court because it rejected several of his proposals on en banc review many years ago. See Jenkins VIII, 959 F. Supp. 1295, aff'd, 122 F.3d 533; Jenkins v. Missouri, 807 F.2d 657 (8th Cir. 1986) (en banc) (Jenkins I). Finally, Judge Heaney expresses disapproval of the actions of the suburban Kansas City schools and refers to "voluntary" programs undertaken in St. Louis. However, his statement underscores an important point–suburban Kansas City school districts, over Judge Heaney's objection, were specifically found to be free of constitutional violations and were duly dismissed from this litigation. See Jenkins I, 807 F.2d at 672-73. On the

other hand, St. Louis suburban schools, under threat of a finding of constitutional complicity by the Court of the Eastern District of Missouri, entered into a settlement agreement, enforceable by the district court, in which a program of state-funded inter-district transfers were stipulated to and required. See Liddell v. Missouri, 731 F.2d 1294, 1302-09 (8th Cir. 1984) (en banc).

Judge Heaney, in footnote 10, questions my taxing and spending figures for the educational operations of the KCMSD. First, he cites single-year figures for the 1998-1999 school year for three affluent suburbs of St. Louis and one small affluent district near Kansas City, while I cite long-term average comparisons for KCMSD and the school districts across Missouri. But, to consider the 1998-1999 school year with Judge Heaney, KCMSD spent $8,239 for school operations, excluding capital improvements, while the surrounding suburban school districts spent an average of $5,834 per pupil. In general, no matter how you manipulate isolated figures, there is simply no doubt that over the last fourteen years, KCMSD has spent substantially more per student per year than any other Missouri school district.

Judge Heaney also seems to misunderstand and, therefore, misapply my discussion of the two billion dollars estimate for the cost of the court's desegregation plan. He misses the point that the two billion dollars mentioned is for the desegregation plan *alone* and this amount is above and beyond the usual annual expenses for educational operations of KCMSD. Indeed, excluding capital expenditures, KCMSD has had total operational expenditures of approximately one billion dollars since July 1, 1997, alone. A very recent illustration of Judge Heaney's erroneous calculations can be found in the record for operational expenditures by KCMSD from July 1, 1997, through June 30, 1999. The two years of expenditures, excluding capital improvements, amounted to $679,196,524, or, $9,426 per student per year and the record establishes that per student costs for earlier years of the desegregation plan have almost always equaled or exceeded these more recent figures. This is, of course, an amount far different from Judge Heaney's fourteen-year unsupported calculation of $3,900 per pupil.

In a similar vein, Judge Heaney takes me to task for my accurate statement that

So after fifteen years, we are called upon to decide only one issue–whether the district court was correct in dismissing this costly and seemingly endless case without holding an evidentiary hearing.[15]

---

educational test scores have "remained static or have declined" during the life of the desegregation plan. In rebuttal, he cites results from school year 1993-1994. What he does not note is that at the achievement gap hearing in 1997, Dr. William Trent, Judge Clark's preferred expert, noted that some time during the 1994-1995 school year "a new test form" with "different scaling" was used. See Transcript at 1289. Similar evidence is contained elsewhere in the record. I submit that such changes make year-to-year comparisons problematic. However, without dispute, test scores experienced a steady decline from the year cited by Judge Heaney until at least the end of the 1999 school year. In any event, although changes occurred during this period, the beginning and ending figures in my table are absolutely correct as is my conclusion that recurring ITBS, TAP and MAP scores indicate that advances in educational achievement did not occur over time especially in the upper elementary grades and in high school.

Finally, Judge Heaney claims that my conclusions on racial isolation by school are misleading, and points to a short period of time when several schools dropped below a ninety percent minority level, the level above which the term "racial isolation" is definitionally applied. While he is correct for this limited period, he also admits that due to changing neighborhood demographics and other unstated reasons, the number of racially isolated schools (i.e., ninety percent or higher minority population) has now reached the level I set forth in the body of my dissent. And, of course, he doesn't mention that, in part, this apparent resegregation is a result of a limitation on remedies available to the federal court imposed by the Supreme Court in Jenkins III. Thus, my statement that the Kansas City schools remain as racially segregated today as when the litigation began is accurate.

[15]The class contends the hearing held on January 7, 2000, was not sufficient because the KCMSD had the burden of proof on unitary status. However, burden of

I agree with Judge Loken that in 1997 both the district court and this court violated the Supreme Court's mandate in Jenkins III by shifting the burden of proof on the issue of whether an achievement gap is a vestige of a *de jure* segregated school system. I write separately only to emphasize that even if such an achievement gap can be correctly viewed as a vestige of prior discrimination, the district court had more than sufficient evidence in the record to rule that KCMSD had shouldered its burden of showing that it had eliminated the gap to the extent practicable. This entitled KCMSD to a determination of unitary status.

Unitary status (and final relief from court control) is achieved when the vestiges of prior discrimination have been eliminated "*to the extent practicable*." Missouri v. Jenkins, 515 U.S. 70, 102 (1995) (Jenkins III) (emphasis mine). The class now concedes that the only remaining vestige in this case, if any, lies within a portion of a black-white educational achievement gap that exists among the students of KCMSD. This theory was conceived by Dr. William Trent and adopted by the district court in Jenkins VIII after a three-week-long hearing held to determine, in part, the State's motion for unitary status of KCMSD. 959 F. Supp. at 1158.

As a threshold matter, I note that any evidence that such a vestige exists in KCMSD is dubious at best. Even a cursory examination of the bases for Dr. Trent's

---

proof is only an issue if the evidence stands in equipoise. Additionally, a party with the burden of proof is, of course, allowed to rest on the record before the court in order to shoulder both its burden of production and persuasion. Further, it is odd that the beneficiary of another party's burden, as the class is here, would have cause to complain, especially since an unfettered opportunity to rebut anything in the record thought persuasive to the district court was afforded the class by the court. If procedural due process is the argument, under existing precedent, the class has been afforded more process than was due.

opinions reveal them to be nothing more than guesses and speculation. This court's reliance on a black-white achievement gap to measure lingering effects of invidious segregation runs contrary to the finding of every other Circuit Court that has considered the issue. See United States v. City of Yonkers, 197 F.3d 41, 54-55 (2d Cir. 1999); People Who Care v. Rockford Bd. of Educ., 111 F.3d 528, 537-38 (7th Cir. 1997); Coalition to Save Our Children v. State Bd. of Educ., 90 F.3d 752, 776-77 (3d Cir. 1996). In fact, Dr. Trent's testimony on this purported phenomenon was rejected by the First Circuit. See Wessmann v. Gittens, 160 F.3d 790, 804 (1st Cir. 1998). Similar evidence based upon Dr. Trent's methodology was held inadmissible under Daubert standards by the Seventh Circuit. See People Who Care, 111 F.3d at 537. Nonetheless, this court clings to the claimed existence of such a vestige of discrimination.[16]

---

[16]In footnote 6 of his opinion for the court and his separate concurrence, Judge John R. Gibson faults my concern for the merits of this case. Although Judge Gibson's formulation of the issue on appeal is slightly different than I have stated, ante at 8, we both agree that the correctness of Judge Whipple's determination of the existence of unitary status in KCMSD is a component of the question at hand. It is my position that if KCMSD has reached unitary status, Judge Whipple should be affirmed. Thus, the merits of the unitary status holding must be reviewed, and the entire record, not just that developed on November 1 and 2, 1999, must be considered.

In spite of his panel opinion position that he continues to restate in substantial part en banc, Judge Gibson now purports to hinge reversal of Judge Whipple on his failure to schedule and hold a hearing on the subject of unitary status. He cites United States v. Board of School Commissioners, 128 F.3d 507 (7th Cir. 1997), an inapposite case that actually cuts in the opposite direction, for the proposition that the class was deprived of a "constitutional guarantee" of a unitary status hearing. Ante at 11. This deprivation, he posits, requires a reversal and remand. Other than Board of School Commissioners, which unremarkably holds that you cannot impose *more* (rather than less as Judge Whipple proposes) requirements on a school district without notice and

a hearing, Judge Gibson cites no authority for this newly minted constitutional guarantee. 128 F.3d at 512. I believe there is no such guarantee whether based upon due process, equal protection or any other constitutional provision. Under the procedures followed, the class was clearly afforded more due process than any apposite precedent has ever required.

Judge Gibson also argues that the merits of Judge Clark's 1997 decision, finding a purported vestige of prior discrimination wrapped up in an achievement gap, are beyond consideration by the court en banc. This argument is apparently based upon a "law of the case" theory. Again, he cites no precedent for this proposition and indeed, the argument turns law of the case principles upside down. This is especially true when the court en banc is considering, as here, a previously unreviewed panel opinion for the first time. See Irving v. United States, 162 F.3d 154, 161 (1st Cir. 1998). And, as Judge Gibson himself stated in Liddell "the court en banc should attempt to decide the case correctly rather than consistently." 731 F.2d at 1331.

In 1997, Judge Clark and the panel erroneously disregarded Supreme Court directions concerning burdens of proof and other substantive mandates. Beyond that, there was, as noted in Judge Loken's dissent, a total failure to establish a vestige of discrimination "traceable, in a proximate way, to [a] prior [constitutional] violation." Freeman v. Pitts, 503 U.S. 467, 494 (1992). There was simply nothing offered to Judge Clark beyond speculation and conjecture, and, as cataloged in the body of my dissent, every court that has been approached with this theory has rejected it out of hand.

Finally, Judge Gibson seems to misunderstand my concern that the panel's affirmance of Judge Clark's achievement gap vestige flies directly in the face of the Supreme Court's mandate in Jenkins III. My point is that not only does Green v. County School Board of New Kent County, 391 U.S. 430 (1968), omit student achievement as a factor for consideration for unitary status, Jenkins III specifically excludes this factor because it is controlled, as the Supreme Court noted, by circumstances wholly independent of unlawful discrimination. Jenkins III, 515 U.S. at 100-02. Every other circuit asked to consider any manifestation of scholastic

Contrary to the court's position in Jenkins v. Missouri, 122 F.3d 588 (8th Cir. 1997), Jenkins III does not authorize a purported achievement gap as a vestige. Although not an exhaustive list of the vestiges of discrimination, student achievement is not among the six factors[17] required for unitary status under Green v. County School Bd. of New Kent County, 391 U.S. 430 (1968). In fact, raising a red flag on the problematic nature of an achievement gap as a factor, the Supreme Court noted that many "demographic changes independent" of *de jure* segregation could contribute to a gap. Jenkins III, 515 U.S. at 102. The Court stated "[i]nsistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the KCMSD will be able to operate on its own." Id.

The frailty of an achievement gap as a vestige is dramatized by the testimony of two of the educational experts heard at the January 1997 unitary status hearing–Dr. Trent and Dr. David Armor.[18] Both experts acknowledged that a gap exists nationwide, (Transcript at 1391-92 [Trent]) (Transcript at 437 [Armor]) and Dr. Armor pointed out the gap in Kansas City was lower than the national average gap and lower than the gap

achievement as a vestige factor has agreed with this interpretation of Jenkins III and rejected the proposition. See United States v. City of Yonkers, 197 F.3d 41, 54-55 (2d Cir. 1999); People Who Care v. Rockford Bd. of Educ., 111 F.3d 528, 537-38 (7th Cir. 1997); Coalition to Save Our Children v. State Bd. of Educ., 90 F.3d 752, 776-77 (3d Cir. 1996).

[17]The factors are student assignments, transportation, physical facilities, extracurricular activities, faculty assignments, and resource allocation.

[18]Additionally, it seems inconceivable that this court validated the district court's finding that KCMSD was liable for a portion of an achievement gap that existed even before the children entered the school system. See Jenkins VIII, 959 F. Supp. at 1164-65. But, it did.

in suburban schools surrounding KCMSD. Transcript at 499 & 502-03. Many of the other schools with a similar or greater gap have never been found guilty of race discrimination of any sort. Id. at 502-03. Indeed, this court has determined the suburban Kansas City Schools were discrimination free. See generally Missouri v. Jenkins, 807 F.2d 657 (8th Cir. 1986) (en banc).

Assuming, for the sake of discussion, that the achievement gap is a vestige of discrimination, I turn to the unsupportable position of the class and the court on how to narrow the gap. KCMSD has identified five areas that supposedly contribute to low achievement by its minority students. These areas are (1) expectations by teachers; (2) lack of a core curriculum; (3) ineffective staff development; (4) lack of a comprehensive assessment system; and (5) the absence of accountability at all levels. KCMSD created, and had the court approve, five plans to address these factors (classroom practices, professional development, assessment, accountability, and curriculum). Each of these plans is now purportedly at a different stage of its implementation, ranging from nearly complete to barely underway.[19] All parties

[19]The class, the court and Judges Heaney and Gibson in their concurrences concentrate solely upon the KCMSD educational programs purportedly developed and implemented (or in process of implementation) since Judge Clark's and the panel's adoption of an achievement gap vestige in 1997. However, the record available to Judge Whipple shows that the 1985 KCMSD remedial plan, formulated by Judge Clark and approved by the panel, was designed to achieve "results more in keeping with national norms," with reading skills at such national norms to be achieved within four or five years, and was similar if not almost identical, with one exception, to the present set of plans touted by the class and insisted upon by the panel in its now vacated opinion. Jenkins v. Missouri, 639 F. Supp. 19, 24 (W.D. Mo. 1985), aff'd in part, 807 F.2d 657 (8th Cir. 1986) (en banc). That educational program included:

(a)    An annual evaluation rating of AAA, the highest classification

awarded by the Missouri State Department of Elementary and Secondary Education, for all KCMSD schools.

(b)  Reduction of class sizes to levels below those required for the AAA rating.

(c)  Extensive library improvements through improved media and library resources and through the hiring of at least twenty-two new librarians, thirteen of whom are certified for elementary schools.

(d)  A system-wide computer education program with state-of-the-art automation equipment and highly skilled instructors.

(e)  A reduced teaching load for all teachers and an improved curriculum with additional art, physical education and music programs with specialty teachers.

(f)  Additional school counselors to begin service at the elementary level and to reduce the workload of existing counselors at the secondary level to one full time counselor for each 390 students or fraction thereof.

(g)  A summer school program providing remedial and developmental learning experiences, reinforcement and enrichment instruction and a "desegregative learning experience."

(h)  A full day kindergarten program in all elementary schools in the district.

(i)  An extended day program including before and after school tutoring.

(j)  An extensive early childhood development program.

[k]  An "effective schools" program designed to accomplish changes in the KCMSD from the "bottom up." This program involves money for special programs developed by staff, parents, patrons, administrators, principals, teachers and students.

[l]  Staff development through special training in the principles and goals of the desegregation plan, implementation of effective instructional programs, effective information transmission, imposition of equitable discipline, solving transportation problems, use of school and community resources, and the law applicable to

concede that some of the plans can never be fully implemented because the idea of what "good" educational practices are is always evolving. The class also concedes the remaining obstacle to unitary status is the implementation of the plans to a "satisfactory" level, whatever that may be. However, there is a more fundamental problem.

The undisputed evidence offered at the 1997 hearing shows that non-minority and minority students respond equally to effective teaching and innovative educational

---

school desegregation.

Jenkins v. Missouri, 19 F.3d 393, 398 (8th Cir. 1994) (Beam, J., dissenting to denial of petition for rehearing) (citations omitted).

The above-mentioned staff development plan mirrors the professional development plan and the classroom practices plan that are presently being pursued. The educational program and effective schools programs were focused on raising student test scores and making people accountable . The only current plan that does not appear to have something equivalent in the 1985 order is the assessment plan. That plan, however, is the one that all the parties now agree is fully implemented.

Although the current plans are now advanced as new and necessary for the educational progress needed to close the achievement gap in KCMSD, they really are, as philosopher Yogi Berra might have said, " *déjà vu* all over again." Although Jenkins III now indicates that this grandiose 1985 program was well beyond the remedial authority of the federal court, its establishment and vigorous implementation, at unparalleled cost to taxpayers, amply proves that KCMSD has now done everything "practicable" to achieve unitary status. Victory should be declared and the case should now be dismissed.

techniques.[20] Transcript at 1411-12 (Trent), Transcript at 498 (Armor) and Transcript at 271 (Dr. Christine Rossell). The implemented and to-be-implemented programs at KCMSD will, according to the testimony, raise the test scores of all KCMSD students without regard to race. This laudable and sought after educational result occurs because, as the Supreme Court noted in Jenkins III, a "rising tide lifts all boats." Jenkins III, 515 U.S. at 102. In other words, under the current plan all KCMSD students will improve at the same rate in normalized curve equivalents (NCEs). Clearly then, the evidence shows that the presently approved court educational plan, by itself, will not impact the achievement gap. Without influence from factors well beyond the control of KCMSD, the approach now championed by the class and the court will only serve to make the goal unattainable. In short, when the gap is eliminated, if it ever is, it will not be because of federal court supervision of curriculum and classroom instruction. It will be because of societal changes that are not achievable through use of the remedial power and authority of the federal courts.[21]

Accordingly, the proposed use of an achievement gap to measure lingering discrimination is a misconceived idea, and use of it will never allow KCMSD to reach a "satisfactory" level in the eyes of the class and, perhaps, some members of this court. Under this scenario, federal court supervision will continue for, perhaps, another

---

[20]There is also evidence that higher achieving students will respond better to these new techniques widening the gap even further. (Trent, Transcript at 1411-12).

[21]The court's opinion refers to "[t]he Jenkins class, representing the children of the Kansas City, Missouri School District." Ante at 3. Under the evidence of this case, and the current vestige arguments being advanced by the class, it is, in my view, almost certain that the class does not now represent the interests of all of the children of KCMSD.

twenty-three years. This, of course, is not a lawful application of the clear mandates of the Supreme Court in Jenkins III.

Even if the plans adopted by the court could conceivably close the achievement gap, KCMSD has fulfilled its constitutional obligations to remedy the discrimination to the extent practicable. Under this contingency, the issue before the court is whether the plans have been implemented satisfactorily. The district court's November 1-2, 1999, hearing and the January 7, 2000, hearing demonstrate that they have been. After the November hearing, the district court found the State's accreditation process is: "(1) based on standards that are fully consistent with the Court's desegregation orders; (2) an attempt to infuse accountability in the KCMSD that is fully consistent with the Court's desegregation orders; and (3) unlikely to engender the high degree of negative consequences that could prevent compliance with the United States Constitution." Jenkins X, 73 F. Supp. 2d at 1077.

These holdings have not been appealed by any of the parties. And, if they have been, they are clearly supported by the record. The court heard testimony from Dr. Marilou Joyner of Missouri's Department of Elementary and Secondary Education, which is responsible for evaluating the school district and making recommendations about accreditation. Dr. Joyner testified that all five of the court-approved plans conform to state accreditation requirements. Additionally, KCMSD offered evidence and neither the class nor the court has disputed the showing that it was firmly committed to continue with the implementation of the plans approved by the district court as the best way to meet the state standards–a necessary step to avoid eventual implementation of the de-accreditation threat.

In Freeman v. Pitts, 503 U.S. 467 (1992), the Supreme Court stated that one of the factors that should inform the court's discretion in deciding unitary status was

"whether retention of judicial control is necessary or practicable to achieve compliance with the decree." Id. at 491. Additionally, as we have said in other discrimination cases, when a state takes independent action that will address the court's remedial concerns, the court should step aside. See Liddell v. Special Sch. Dist., 149 F.3d 862, 870-71 (8th Cir. 1998). These findings make it clear the district court's presence in the litigation is no longer necessary to achieve constitutional objectives and the State has adequately addressed the court's remaining remedial concerns. As a result, the district court was correct in finding that unitary status had been achieved.

In an effort to dodge or obfuscate the real issues of the case, the class, as earlier indicated, complains that it was a violation of due process and reversible error for the court to dismiss the case without holding a previously contemplated and announced evidentiary hearing.[22] This argument is specious and is not supported by the law of this or any other circuit. At the remedy stage of a school desegregation case, the district court proceeds under its equitable authority, controlling the outcome of the litigation with a series of injunction-like orders. This court, in past opinions in this case, has described the broad and continuing equitable authority of the district court as "'characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' Milliken v. Bradley, 433 U.S. 267, 288 (1977) (quoting Brown v. Board of Educ., 349 U.S. 294, 300 (1955))." Jenkins XIV, 122 F.3d at 600; see also Jenkins v. Missouri, 931 F.2d 470, 482 (8th Cir. 1991).

Furthermore, an evidentiary hearing was not required, as the district court had all the requisite evidence before it for making a reasoned determination. In particular, a district court may take such action if the court sees that the underlying factual or legal

---

[22]It is true, as the court sets forth, that there were discussions of a January 3, 2000, hearing on July 19, 1999, August 24, 1999, and August 26, 1999.

issues have changed.  See United States v. Texas, 158 F.3d 299, 312 (5th Cir. 1998); Alberti v. Klevenhagen, 46 F.3d 1347, 1366 (5th Cir. 1995); United States v. City of Miami, 2 F.3d 1497, 1506 (11th Cir. 1993).  "'Sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.'"  Rufo v. Inmates of the Suffolk County Jail, 520 U.S. 367, 380 (1992) (quoting Railway Employees v. Wright, 364 U.S. 642, 647 (1961)).  Such circumstances have obviously arisen in this case.

On October 21, 1999, well after the court's discussions of a potential January 3, 2000, hearing, a major event changed the nature and scope of this litigation.  The Missouri State Board of Education voted to withdraw educational accreditation of KCMSD as of May 1, 2000, and insert itself into the educational picture in Kansas City.  As a result of the State's action, the KCMSD quickly made a motion in the district court to have this action declared *void ab initio*.  The district court responded immediately and held the evidentiary hearing of November 1 and 2, 1999.

The State's appearance through the accreditation process dramatically altered the landscape of the litigation.  With court-approved plans and State requirements in accord, one with the other, as earlier noted, every item of evidence necessary to determine unitary status was in place before the district court.  Thus, the court's unitary status holding, based upon the entire record, was clearly correct.  An educational gap that purportedly represents a vestige of long eliminated *de jure* segregation has not been established and even if it has been, with currently approved educational programs, it will not be and, indeed, cannot be mitigated, much less eradicated.  The idea that KCMSD has now, after twenty-three years, done everything practicable to "remedy the [earlier] violation to the extent practicable," is not clearly erroneous–it is clearly

correct.  For the court to have held otherwise on this record would have been an abuse of discretion.

All current requirements being imposed by this litigation extend well beyond any lawful remedies for violations of distant acts of *de jure* segregation.  And, this case is not about a federal district judge who made a procedural mistake by not holding yet another evidentiary hearing entailing countless thousands of additional taxpayer dollars for court time, staff time, attorney fees and expert witnesses.  It is about matters that a federal court no longer has a legitimate right to involve itself in.

It is long past the time to follow the admonition of the Supreme Court in Jenkins III and "'restore state and local authorities to the control of a school system that is [now] operating in compliance with the Constitution.'"  515 U.S. at 101 (quoting Freeman, 503 U.S. at 489).  "Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system."  Freeman, 503 U.S. at 490.

The KCMSD is unitary.  I would affirm the district court.[23]

---

[23]Since the court seems bent upon an alternate course, it is proper to make one additional observation.  The court in its footnote 6 states that it finds it unnecessary to discuss the merits of Judge Whipple's order concerning unitary status.  Although not explicitly stated, this is presumably because the only issue reached by a majority of the court en banc is whether an evidentiary hearing should have been conducted by Judge Whipple prior to his decision,  So, in my view, footnote 6, Chief Judge Wollman's concurrence joined by Judge Morris Sheppard Arnold and this dissent should be a clear signal to Judge Whipple that he is now free to set a hearing date that accommodates a reasonable preparation period for the parties and to then hear and decide the unitary status of KCMSD free and clear of any verbiage contained in the panel opinion which was vacated by the grant of en banc consideration in this case.

# ADDENDUM

## IOWA TEST OF BASIC SKILLS TEST SCORES

| Grade | 1987-88 Math | 1998-99 Math | Change | 1987-88 Reading | 1998-99 Reading | Change |
|---|---|---|---|---|---|---|
| K | 53.4 | 59.6 ('95) | 6.2 | 63.0 | 65.4 ('90) | 2.4 |
| 1 | 48.9 | 48.3 ('96) | -0.6 | 45.8 | 47.5 ('96) | 1.7 |
| 2 | 50.6 | 47.2 ('95) | -3.4 | 45.6 | 42.5 ('95) | -3.1 |
| 3 | 43.4 | 36.9 | -6.5 | 41.3 | 37.2 | -4.1 |
| 4 | 46.0 | 40.9 ('98) | -5.1 | 42.6 | 39.0 ('98) | -3.6 |
| 5 | 43.8 | 40.1 | -3.7 | 43.1 | 39.8 | -3.3 |
| 6 | 42.2 | 36.5 ('98) | -5.7 | 40.6 | 37.6 ('98) | -3.0 |
| 7 | 40.9 | 37.7 ('98) | -3.2 | 42.0 | 38.5 ('98) | -3.5 |
| 8 | 40.3 | 36.2 | -4.1 | 41.7 | 37.8 | -3.9 |
| | 1989-90 Math | 1997-98 Math | | 1989-90 Reading | 1997-98 Reading | |
| 9 | 37.7 | 30.8 | -6.9 | 41.4 | 34.0 | -7.4 |
| 10 | 39.7 | 35.1 | -4.6 | 41.8 | 37.2 | -4.6 |
| 11 | 41.2 | 39.6 ('99) | -1.6 | 41.6 | 37.5 ('99) | -4.1 |
| 12 | 42.0 | 41.7 | -0.3 | 41.3 | 41.4 | 0.1 |

# Missouri Assessment Program Math Results

|  |  | Step 1 | Progressing | Nearing Proficiency | Proficient | Advanced |
|---|---|---|---|---|---|---|
| Fourth |  |  |  |  |  |  |
|  | 1997 | 15% | 42% | 29% | 11% | 3% |
|  | 1998 | 13% | 40% | 35% | 10% | 1% |
|  | 1999 | 11% | 39% | 38% | 10% | 1% |
| Eighth |  |  |  |  |  |  |
|  | 1997 | 60% | 29% | 6% | 3% | 0% |
|  | 1998 | 55% | 30% | 11% | 3% | 1% |
|  | 1999 | 46% | 40% | 12% | 2% | 0% |
| Tenth |  |  |  |  |  |  |
|  | 1997 | 68% | 21% | 8% | 3% | 0% |
|  | 1998 | 68% | 22% | 9% | 1% | 0% |
|  | 1999 | 65% | 26% | 7% | 2% | 0% |

# Missouri Assessment Program Social Studies Results (1999)

|  | Step 1 | Progressing | Nearing Proficiency | Proficient | Advanced |
|---|---|---|---|---|---|
| Fourth | 29% | 39% | 24% | 7% | 1% |
| Eighth | 48% | 20% | 19% | 12% | 2% |
| Eleventh | 56% | 21% | 19% | 3% | 1% |

## Missouri Assessment Program Communication Arts Results

|  |  | Step 1 | Progressing | Nearing Proficiency | Proficient | Advanced |
|---|---|---|---|---|---|---|
| Third |  |  |  |  |  |  |
|  | 1998 | 29% | 31% | 29% | 11% | 0% |
|  | 1999 | 26% | 32% | 31% | 11% | 0% |
| Seventh |  |  |  |  |  |  |
|  | 1998 | 48% | 23% | 18% | 11% | 1% |
|  | 1999 | 37% | 27% | 24% | 11% | 1% |
| Eleventh |  |  |  |  |  |  |
|  | 1998 | 47% | 19% | 25% | 8% | 1% |
|  | 1999 | 42% | 23% | 25% | 9% | 0% |

## Missouri Assessment Program Science Results

|  |  | Step 1 | Progressing | Nearing Proficiency | Proficient | Advanced |
|---|---|---|---|---|---|---|
| Third |  |  |  |  |  |  |
|  | 1998 | 20% | 27% | 34% | 16% | 2% |
|  | 1999 | 20% | 30% | 35% | 13% | 1% |
| Seventh |  |  |  |  |  |  |
|  | 1998 | 58% | 31% | 9% | 3% | 0% |
|  | 1999 | 54% | 29% | 11% | 5% | 1% |
| Eleventh |  |  |  |  |  |  |
|  | 1998 | 59% | 27% | 12% | 1% | 0% |

| | 1999 | 47% | 38% | 14% | 1% | 0% |
|---|---|---|---|---|---|---|

LOKEN, Circuit Judge, with whom BOWMAN and BEAM, Circuit Judges, join, dissenting.

I respectfully dissent.  In <u>Missouri v. Jenkins</u>, 515 U.S. 70 (1995) (<u>Jenkins III</u>), the Supreme Court held that much of the remedy imposed by the district court and upheld by a panel of this court went beyond the permissible bounds of an equitable school desegregation decree.  The Court defined the scope of an appropriate remedy:

> the proper response by the District Court should have been to eliminate to the extent practicable the vestiges of prior *de jure* segregation within the KCMSD:  a systemwide reduction in student achievement and the existence of 25 racially identifiable schools with a population of over 90% black students.

515 U.S. at 90.  Among the remedial measures the Court reversed was a mandate to fund "quality education programs."  In rejecting this court's attempt to fill in the gaps in the district court's analysis of that issue, the Supreme Court cautioned:

> Although the District Court has determined that "[s]egregation has caused a system wide *reduction* in achievements in the schools of the KCMSD," 639 F. Supp., at 24, it never has identified the incremental effect that segregation has had on minority student achievement or the specific goals of the quality education programs.

515 U.S. at 101 (emphasis in original).  The Court remanded, instructing the district court "that its end purpose is not only 'to remedy the violation' to the extent practicable, but also 'to restore state and local authorities to the control of a school

-45-

system that is operating in compliance with the Constitution.'" Id. at 102, quoting Freeman v. Pitts, 503 U.S. 467, 489 (1992).

On remand, the district court took up the question of an alleged achievement gap between black and white students in the KCMSD. Its prior findings as to vestiges -- *as determined by the Supreme Court* -- were limited to finding a systemwide reduction in student achievement. Yet the district court on remand did not make the critical finding that any achievement gap *among students within the KCMSD* was also a vestige of discrimination with "a causal link to the *de jure* violation being remedied." Jenkins III, 515 U.S. at 96. Instead, the district court held that "the plaintiffs are entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the defendants." Jenkins v. Missouri, 959 F. Supp. 1151, 1157 (W.D. Mo. 1997). Having ducked the critical causation question, the district court proceeded to quantify a present "race effect" of 2.6 normalized curve equivalents (NCEs) and order that it be remedied. A panel of this court again affirmed. Jenkins v. Missouri, 122 F.3d 588 (8th Cir. 1997).[24]

In my view, the district court and this court violated the Supreme Court's law of the case by deciding in 1997 to *presume* that a present-day achievement gap is a vestige of the *de jure* segregated school system maintained under Missouri law prior to 1954. The result of shifting the burden of proof was to place on KCMSD the impossible burden of proving that no part of the present-day gap -- which ironically is significantly less in Kansas City than the national norm, see 959 F. Supp. at 1158 --

---

[24]The order to close the achievement gap by 2.6 NCEs effectively ignored the distaste expressed by all nine Justices for decrees that require a certain level of statistical performance on standardized tests before unitary status can be found. See Jenkins III, 515 U.S. at 101-02; id. at 148-49 (Souter, J., dissenting).

is causally linked to *de jure* segregation in the distant past.  See Coalition to Save Our Children v. Board of Educ., 90 F.3d 752, 776-77 (3d Cir. 1996); see also Freeman v. Pitts, 503 U.S. 467, 503-06 (1992) (Scalia, J., concurring).[25]  The Supreme Court has only placed this burden of proof on defendants when resolving claims that lingering segregation or racial imbalance were vestiges of *de jure* segregation.[26]  Even in those cases, the Court has stated that the causal presumption diminishes "[a]s the de jure violation becomes more remote in time."  Freeman, 503 U.S. at 496; see id. at 503-06 (Scalia, J., concurring); Jenkins III, 515 U.S. at 118 (Thomas, J., concurring).

By shifting the burden of proof on an ancillary issue such as student achievement, the district court created a regime of federal court supervision that will seemingly never end.  The case was then assigned to a new district judge, who recognized that the achievement gap mandate, improperly imposed by his predecessor and this court some three years ago, frustrates the Supreme Court's directive to

---

[25]The district court based its finding of a 2.6-NCE quantitative gap on expert opinion evidence that was likely inadmissible under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  See People Who Care v. Rockford Bd. of Educ., 111 F.3d 528, 534, 537-38 (7th Cir. 1997).  In any event, that evidence wholly failed to establish that any race-related portion of the achievement gap was *caused by* the prior *de jure* segregation.  See United States v. City of Yonkers, 197 F.3d 41, 54-55 (2d Cir. 1999), cert. denied, --- S. Ct. ---, 68 U.S.L.W. 3536 (May 22, 2000).  "The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the de jure violation being remedied."  Jenkins III, 515 U.S. at 96.

[26]See United States v. Fordice, 505 U.S. 717, 738-39 (1992); Freeman, 503 U.S. at 494; Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 537 (1979); Keyes v. School Dist. No. 1, 413 U.S. 189, 209-10 (1973); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 26 (1971).

promptly restore this school district to local control.[27]  Accordingly, when KCMSD virtually admitted that it could not meet the 2.6-NCE mandate for the foreseeable future, the district court declared unitary status.  Sadly, this court now decides to perpetuate its disregard for the Supreme Court's instructions in Jenkins III by requiring more open-ended litigation over whether KCMSD has complied with an order to remedy a present-day condition that has never been proved to be a vestige of prior *de jure* segregation.  I would affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[27]"Insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the KCMSD will be able to operate on its own."  Jenkins III, 515 U.S. at 102.